THE PEOPLE OF THE STATE OF NEW YORK ex rel. WILLIAM KEMMLER, Appellant, v. CHARLES F. DURSTON, as Warden of the State Prison at Auburn, New York, Respondent.

*Punishment by death by electricity — not a cruel and unusual punishment under the Constitution of the State of New York—the application of the English Bill of Rights and of the provisions of the United States Constitution to the legislative department of the government, considered — chapter 489 of 1888.*

The petition, issued on the application for a writ of *habeas corpus*, alleged that the cause or pretense of the imprisonment complained of was that, after the indict. ment and trial of the relator for the crime of murder in the first degree, and his conviction thereof in a Court of Oyer and Terminer of Erie county, he was sentenced by that court to undergo a cruel and unusual punishment for such crime, contrary to the Constitution of the State of New York and of the United States, and that he was deprived of liberty and threatened with deprivation of life by virtue of such illegal sentence and judgment of the court.

The return to the writ, which was not traversed as to the facts, showed that the sentence was pronounced in pursuance of chapter 489 of the Laws of 1888, which substituted a death by electricity for death by hanging previously prescribed.

*Held,* that it was not competent for the courts to inquire whether the legislature was ignorant of the character and effect of the penalty prescribed by the act of 1888, or to decide in this case, in which that fact did not appear upon the face of the act, that the death imposed thereby was a cruel and unusual punishment, and thus to overrule the judgment of the legislature in that regard.

*Semble,* that the provisions of the Constitution of the State of New York, against cruel and unusual punishments, were intended as a restriction upon the legislative authority, and that should a case arise, in which the statute prescribing the punishment was, on its face, repugnant to such provisions, it would be the duty of the courts to enforce such constitutional provisions.

That the provisions of chapter 489 of 1888 were not, upon their face, repugnant to these constitutional provisions.

*Semble,* that the whole tenor of the English Bill of Rights, its title, and the history of the times and of the emergencies which gave rise to this enactment, forbade the idea that it was intended in any manner to restrict or control the law-making power; that it was, in fact, enacted to restrain the oppressive exercise, by judges appointed by the crown, of the discretion conferred upon them by the common law in respect to the punishment of criminals.

*Quære,* whether the provisions of article 8 of the United States Constitution were intended to limit or control the action of the courts in prescribing penalties for crime.

Appeal by the relator, William Kemmler, from an order of Hon. S. Edwin Day, County Judge of Cayuga County Court, entered

in the office of the clerk of the county of Cayuga on the 14th day of October, 1889, remanding the relator to the custody of Charles F. Durston, as agent and warden of the State prison at Auburn, New York.

*W. Bourke Cockran*, for the appellant.

*William A. Poste*, deputy attorney-general, for the respondent.

DWIGHT, J.:

The relator, being in the custody of the respondent as agent and warden of the State prison at Auburn, sued out a writ of *habeas corpus* to inquire into the cause of detention, which was made returnable before the county judge of the county where he was imprisoned.

The petition for the writ of *habeas corpus* alleged that the cause or pretense of the imprisonment complained of was that, after the indictment and trial of the relator for the crime of murder in the first degree, and his conviction thereof, in the Court of Oyer and Terminer of Erie county, he was sentenced by that court to undergo a cruel and unusual punishment for such crime, contrary to the Constitution of the State of New York and of the United States; and that he was deprived of liberty and threatened with deprivation of life by virtue of such illegal sentence and judgment of the court.

The return of the respondent, which was not traversed as to the facts, showed that the sentence or judgment of the court mentioned in the petition was pronounced, and the warrant, under which the relator was held, was issued to the respondent thereupon, in pursuance of chapter 489 of the Laws of 1888, which amended the Code of Criminal Procedure in respect to the time and mode and place of inflicting the death penalty; and, among other things, substituted death by electricity for death by hanging. Section 505 of the Code, as thus amended, reads as follows: "The punishment of death must, in every case, be inflicted by causing to pass through the body of the convict, a current of electricity of sufficient intensity to cause death, and the application of such current must be continued until the convict is dead."

To the return of the respondent a demurrer *ore tenus* seems to have been interposed in behalf of the relator, and an offer was

made to prove that the punishment prescribed by the statute quoted was a " cruel and unusual punishment." The offer was objected to by counsel for the respondent, but the objection was overruled, and a referee was appointed to take and report such proofs as should be offered by either party on the question proposed. Very voluminous evidence, offered by counsel on both sides, was taken, accordingly, and returned to the county judge, and is printed in the record before us.

The order below, dismissed the writ and remanded the prisoner to the custody of the agent and warden of the State prison. An appeal from that order, brings the case into this court, and presents a question very novel in its character and in the manner of its presentation. The attempt is to enforce the provision of the Constitution against cruel and unusual punishments by judicial condemnation of an act of the legislature based upon evidence *aliunde* the statute assailed, intended to show the character of the penalty prescribed thereby.

The constitutional provision here invoked originated in the well-known " Bill of Rights " of England. That celebrated enactment was one of the first fruits of the great revolution of 1688. It was entitled " An act declaring the rights and liberties of the subject, and settling the sucession of the crown." It has been said to be, " next to Magna Charta, the greatest landmark in the constitutional history of England, and the nearest approach to the written Constitutions of other countries." (Ency. Brit.) It had been first proposed to the prince and princess of Orange by the revolutionary convention, which called them to the throne of England, as a declaration of the principles and conditions upon which the call was made; and, being accepted by them, with the crown, was enacted as a Bill of Rights by the parliament into which the convention was resolved. This declaration recited, in a preamble, the oppressive and unconstitutional measures and proceedings of the lately deposed king and his ministers and judges, among others, " that excessive bail hath been required of persons committed in criminal cases to elude the benefit of the laws made for the liberty of the subject ; and excessive fines have been imposed, and illegal and cruel punishments inflicted," * * * all of which it declared were " clearly and directly contrary to the known laws and statutes and freedom of this realm ; " and it went on to declare, among other things, " that excessive bail

ought not to be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

Just a century later, the particular provision in question was adopted into the Constitution of the United States as the eighth article of the amendments proposed by the first congress, " begun and held March 4, 1789," and which were ratified by the required number of the original thirteen States.   The variation in the terms of the constitutional provision of the United States from those employed in the declaration of the English parliament, consisted in the substitution of " shall not," in the former, for " ought not " in the latter.

The provision was first engrafted upon the fundamental law of this State in the Constitution of 1846, where it occurs with the addition of the clause, " nor shall witnesses be unreasonably detained."

It seems very clear that no provision of the English Bill of Rights was intended to operate as a restriction upon the power of the legislative branch of the government of England.   That enactment was, as has been said, in the nature of a compact between the crown and the parliament as the representative of the People.   Its protest was chiefly against acts of tyranny and oppression on the part of the crown, in excess or abuse of its prerogative, and in derogation of the authority of parliament.   The acts declared illegal were those of the administrative and judicial departments of the government. The whole tenor of the bill, its title, the history of the times and of the emergencies which gave it occasion, forbid the idea that it was intended, in any manner, to restrict or control the law-making power. Besides (in respect to the particular provision here in question), at the time of its enactment the punishments of crimes were prescribed not by statute, but wholly by the common law, and the common law in this respect was largely subject to the discretion of the judges. It was the oppressive exercise of that discretion by judges appointed by the crown, and removable at its pleasure, that was among those things denounced by the preamble and declared to be illegal in the body of the bill ; and the compact, in this particular, on the part of the crown, may be said to have been not to appoint or retain in office judges capable of grossly abusing the judicial authority. Moreover, the context of the provision against cruel and unusual punishments, on the principle of *noscitur a sociis*, opposes the

assumption that it had any reference to legislative action since the fixing of bail and the imposition of fines pertained wholly to judicial procedure.

In regard to the similar provision of the Constitution of the United States (art. 8, *supra*) it is, in the first place, to be observed that it has no application to any department of the government of the States, but is a restriction upon the federal government only. (*Barron* v. *Baltimore*, 7 Pet., 243; *Pervear* v. *Commonwealth*, 5 Wall., 475; *Jackson* v. *Wood*, 2 Cow., 819; *Barker* v. *People*, 3 id., 686.) In this respect it differs from the inhibition of the passage of *ex post facto* laws which when it first occurs (in sub. 3, § 9, art. 1) restricts the power of congress, and when repeated in subdivision 1 of the next section, is expressly addressed to the States.

Whether the provision of artitle 8 was intended to limit or control the action of congress in prescribing penalties for crime might be questioned upon some of the grounds mentioned under the point last discussed, especially because, at the formation of the Federal government, the common law of England prevailed in the communities which the new government embraced; the penalties for crimes had not been fixed by statute, and no change in this respect was introduced or foreshadowed by the Constitution.

The case was quite otherwise with the State of New York at the time of the insertion of the provision in question into its Constitution. Then, after nearly sixty years of constitutional existence as a State, the punishment of crime was almost wholly in the control of the legislature. Gradually the statutory definitions and statutory penalties of crimes had superseded those of the common law, until by the revision of 1829 a complete codification was attempted of all the penal laws of the State, the intention being to define either specifically or by classes, all crimes cognizable by its courts, and to prescribe the character of the punishment to be inflicted in every case. Under the Revised Statutes the judicial discretion was limited to fixing the term of the imprisonment to be inflicted, or the amount of the fine to be imposed. The death penalty was confined to the three felonies of treason against the State, murder and arson in the first degree; the punishment of all other felonies was limited to imprisonment in the State prison for life or a term of years, and

of misdemeanors, to fine or imprisonment in the county jail, or both; and the term of imprisonment, either in the State prison or in the county jail was, in most cases, limited by a maximum fixed by statute.

Such being the case, it would seem that the provision in the State Constitution against cruel and unusual punishments, if it were to have any practical operation, if it was anything more than a mere glittering generality calculated to please the popular fancy and gratify the popular taste for a "declaration of rights," must have been intended as a restriction upon the legislative authority; and such — without further discussion of the question — we conclude is the import and effect of the provision; and that if occasion should arise, it would be the duty of the courts to enforce it. We have no doubt that if the legislature of this State should undertake to prescribe for any offense against its laws, the punishment of burning at the stake, breaking on the wheel, disemboweling or hanging in chains (to perish by exhaustion), it would be the duty of the courts to pronounce upon such attempt, the condemnation of the Constitution.

In the case supposed no doubt could exist, because the statute would be, on its face, repugnant to the provision of the Constitution against cruel and unusual punishments. It is common knowledge that the punishments mentioned are unusual, and by the common consent of mankind they are cruel punishments, because they involve torture and a lingering death.

The question is now to be answered whether the legislative act here assailed, is subject to the same condemnation. Certainly it is not so on its face, for, though the mode of death prescribed is conceded to be unusual, there is no common knowledge or consent that it is cruel; on the contrary, there is a belief, more or less common, that death by an electric current, under favorable circumstances, is instantaneous and without pain. It was, therefore, a question of fact, whether an electric current, of sufficient intensity, and skillfully applied, will produce death without unnecessary suffering. Is this question open to the investigation of the court, when called upon to decide upon the validity of the law in question, or must it be presumed to have been determined by the legislature in favor of the mode of punishment prescribed? It may be safely assumed

that now, for the first time in the history of our jurisprudence,. has the court been called upon to enter upon such an investigation. Ordinarily, the question of the constitutionality of the legislative act is a question of interpretation merely, viz., what is the scope and intent of the constitutional provision invoked; and what — judged by the legal construction of its terms, aided, if necessary, by the history and circumstances of its enactment — is the legal import and effect of the statute assailed; and, when the two are so interpreted, is the latter in clear and undoubted repugnance to the former? It is conceded that there is nothing in the terms of this act to bring it into hostility to the constitutional provision; and the history and circumstances of its enactment, as demonstrating its. purpose and intent, are of directly contrary effect. It is a part of the history of the State that the legislation in question was. based upon the report of a commission, consisting of three well-known citizens, appointed by chapter 352 of the Laws of 1886,. "to investigate and report to the legislature   *   *   *   the most. humane and practical method known to modern science of carrying into effect the sentence of death in capital cases." The report of the commission, presented to the legislature in January, 1888,. detailed and summarized the results of their investigations and experiments, and was accompanied by the draft of a bill, recommended for passage, and which was, at the same session of the legislature, enacted into the statute amending the Code of Criminal Procedure, the validity of which is here in question. If anything were needed to fortify the presumption of the humane and merciful intent of that statute,. this brief history would supply it. Of course, there is no contention against this presumption; but the objection of the relator is, in substance, that notwithstanding its manifest purpose to conform the statute, by this amendment, more closely than before to the letter and spirit of the constitutional provision, the legislature was, in fact, ignorant of the character and effect of the penalty prescribed by the amendment; and that, through ignorance, it has fallen into a palpable violation of the Constitution; and the proposition is to support this objection by proofs *aliunde* the statute.

The inquiry, we believe, it is not competent for the court to make. No rule of law is better settled than that every intendment is in favor of the constitutional validity of legislative acts. (*The People*

v. *Home Ins. Co.*, 92 N. Y., 328; *Matter of Elevated R. R. Co.*, 70 id., 327; *The People ex rel. Bolton* v. *Albertson*, 55 id., 50.) The rule includes intendments of fact as well as of legal interpretation, and we are bound to presume that the legislature knew, even though the court may be ignorant of the facts necessarily involved in the legislative action.

In this respect, the presumption which arises upon the statute must be conclusive on the court, and not liable to be rebutted by proof *aliunde*. There is nothing in the Constitution of our government or in the nature of things, which gives any color to the proposition that, upon a mere question of fact involved in legislation, the judgment of the court is superior to that of the legislature itself; nor is there any authority for the proposition that in respect to such question, relating either to the manner or the matter of legislation, the decision of the legislature can be reviewed by the court.

In the case of *Matter of Elevated Railroad Company* (*supra*), it was said that the courts cannot take proofs *aliunde* for the purpose of ascertaining whether a statute, valid and regular on its face, is unconstitutional; that they cannot go behind the statute itself; that they cannot assume to know that facts necessary to the constitutionality of the legislative act did not exist, but, on the contrary, may assume that the legislature found that those facts did exist. So, too, in respect to the manner of the passage of a bill — whether the constitutional quorum was present, and the vote of a constitutional majority was given in its favor — the statute must be its own evidence, and cannot be rebutted; the question is not one of fact, but of law, to be determined by the record. (*Warner* v. *Beers*, 23 Wend., 125; *People* v. *Devlin*, 33 N. Y., 280.)

It is not merely upon principles of comity between co-ordinate branches of the government of the State, but because of the separate province and responsibility of the legislature from that of the courts, that we hold that the latter are not permitted to inquire whether the former was ignorant of the facts necessary to determine the meaning and effect of the laws which it has enacted; and, in respect to the particular statute in question, that the presumption that the legislature had ascertained the facts necessary to determine that death, by the mode prescribed, was not a cruel punishment, is conclusive upon the court. But, even if the inquiry proposed were

open to the court, our decision upon the question of fact must, undoubtedly, be controlled by the principle that the burden is upon him who assails the law to demonstrate its repugnance to the Constitution in the respect alleged.

In the case of *Dartmouth College* v. *Woodward* (4 Wheat., 518), in which some of the most important questions of constitutional law were settled for all time, Chief Justice Mᴀʀꜱʜᴀʟʟ said : " On more than one occasion this court has expressed the cautious circumspection with which it approaches the consideration of such questions, and has declared that in no doubtful case would it pronounce a legislative act to be contrary to the Constitution ; " and in *Fletcher* v. *Peck* (6 Cranch, 87) the same great judge said : " It is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers."

In *Ogden* v. *Saunders* (12 Wheat., 270) Mr. Justice Wᴀꜱʜɪɴɢᴛᴏɴ said : " It is but a decent respect, due to the wisdom, the integrity and the patriotism of the legislative body, by which any law is passed, to presume in favor of its validity until its violation of the Constitution is proved beyond all reasonable doubt." And in *The People* v. *Albertson* (*supra*) the Court of Appeals of our own State by Aʟʟᴇɴ, J., said : " There should be no reasonable doubt of the unconstitutionality of a statute before it should be annulled by judicial action."

The case of *Hartung* v. *The People* (22 N. Y., 95) is urged upon our attention by counsel for the relator as in some manner impugning the application of this principle in the case of statutes prescribing or regulating the punishment of crime ; but we are unable to see that it has that effect in any degree. That case arose under the act of 1860, which made the offense of murder, previously committed, and even of which the accused had been already convicted, punishable otherwise than as it was punishable at the time of its commission. This was, as Judge Dᴇɴɪᴏ said, " of the essence of an *ex post facto* law ; " but the convict could not complain if the only effect of the new law was to remit a separable portion of the penalty prescribed by the old, and that was held not to be the effect of the new law then in question. It is argued here that the decision was upon the ground that the new penalty *might* turn out to be in excess of that prescribed by the former statute. But there seems to have

been no question of possibilities in the case. The law was absolutely and on its face *ex post facto* as to all cases of the class to which that of the plaintiff in error belonged. On its face it did not lessen, but added a year of imprisonment to the penalty of death formerly imposed. True, the governor, and successive governors might, in the exercise of supposed clemency, refrain from issuing the required warrant for the execution of the death sentence after the convict's year of imprisonment; and so the sword, that forever hung by a single hair, might never fall. But so under the old law might the governor remit or commute the penalty imposed by the sentence of the court. The new law afforded no remission of the penalty of death.

There seems to be no reason, either upon principle or authority, why the rule so strenuously held in regard to the burden of establishing the unconstitutionality of a law, should not apply with full force to an objection based upon matters of fact, if that objection were open to investigation by the court. We have read with much interest the evidence returned to the county judge, and we agree with him that the burden of the proof is not successfully borne by the relator. On the contrary, we think that the evidence is clearly in favor of the conclusion that it is within easy reach of electrical science at this day to so generate and apply to the person of the convict a current of electricity of such known and sufficient force as certainly to produce instantaneous, and, therefore, painless death. It detracts nothing from the force of the evidence in favor of this conclusion that we do not know the nature of electricity, nor how it is transmitted in currents, nor how it operates to destroy the life of animals and men exposed to its force. Neither do we know the nature of the attraction of gravitation, which is the operative force employed in the infliction of death by hanging, nor how that force operates to draw towards each other masses of matter freely moving in space. We know these and all other forces of nature by their effects, and we avail ourselves of them in the daily processes and pursuits of life with a confidence based upon common experience, without inquiry as to the essence of the force or the mode of its operation.

The experiments with electricity as a death-dealing agency, dis-

closed by the evidence, were necessarily confined to the lower animals; but, unfortunately, the experience of mankind in this respect has not been confined to experiments purposely made. Death by stroke of lightning has been known to the world in all ages; and the frequency and publicity of death by accidental contact with electric wires during the last few years, and especially the last few months, has made the deadly power of the electric current shockingly familiar wherever the newspaper is read. In most casualties of this sort, the exposure being wholly accidental, the contact is imperfect, the resistance unregulated, and the force of the current accidentally deflected through the body of the subject, only a fraction of that being transmitted through the wires. Accordingly, in some cases, the victim of the accident has escaped with his life, and, in some cases, death has been accompanied with burnings and contortions. But in all such cases the effects mentioned have evidently been due to lack of force in the current received, or to the imperfect manner of its application to the body of the victim; and the general result of these demontrations, in the light of the scientific evidence in this case, is, as we think, to remove every reasonable doubt that the passage of a current of electricity, of a certain well-determined intensity, through the vital parts of the human body, under chosen conditions of contact and resistance, must result in instant death.

If the question here were of the wisdom and advisability of the proposed change in the mode of inflicting the death penalty, the discussion might be prolonged. As we are confined to the question of the constitutionality of the statute which introduces the change, we deem further discussion unnecessary for the presentation of our views.

The order dismissing the writ of *habeas corpus* and remanding the prisoner must be affirmed.

Barker, P. J., and Macomber, J., concurred.

Order appealed from affirmed.