THE HEALTH DEPARTMENT OF THE CITY OF NEW YORK, Appellant, *v.* THE RECTOR, CHURCH WARDENS AND VESTRYMEN OF TRINITY CHURCH in the City of New York, Respondent.

The legislature, in the exercise of its power to conserve the public health, safety or welfare, may direct that certain improvements or alterations shall be made in existing houses at the owners' expense, and while the requirement must not be unreasonable, either with reference to its nature or cost, yet, when it clearly appears that it tends, in some plain and appreciable manner, to guard and protect the public in the respects specified; that it bears equally upon all members of the same class, and that the cost will not be unreasonable, considering the character of the work required, with reference to the object to be attained, the requirement is constitutional and valid.

It is not requisite to the validity of a legislative enactment of a police nature, which may disturb the enjoyment of individual rights, that provision for compensation for such disturbance be made, where the act does not appropriate private property, but simply regulates its use and enjoyment by the owner.

The provision of the New York Consolidation Act (§ 663, chap. 410, Laws of 1882, amended by chap. 84, Laws 1887), declaring that tenement houses in the city previously erected shall be furnished by the owners with water, "when they shall be directed so to do by the board of health, in sufficient quantity at one or more places on each floor occupied or intended to be occupied by one or more families," is a proper exercise of the police power of the state, both as a guard to the public health and as a protection against fire, and is constitutional. (BARTLETT, J., dissenting.)

The language of the provision requiring the supply of water to be "in sufficient quantity at one or more places on each floor" does not leave the number of places of supply entirely to the discretion of the board of health; one place on each floor, if it can be made fairly accessible to all the occupants of the floor, is all that can be required. (BARTLETT, J., dissenting.)

The health department of said city caused to be served on defendant's agent a notice requiring it to provide "suitable appliances to receive and distribute a supply of water for domestic use" on the floors specified of two buildings owned by it, within a time specified. In an action to recover penalties imposed by the act for a failure to comply with said notice, defendant claimed that the houses in question were not tenement houses within the meaning of the act. They were houses constructed many years ago as dwelling houses, each with two stories, an attic and basement, and their internal arrangements had not been altered; one of the houses, however, was occupied by three families, the other, by six. *Held*, that the claim was untenable.

Defendant offered evidence on the trial as to the necessary cost of complying with the order; also, that the introduction of the appliances called for with the necessary sinks and waste pipes would cause great danger of injury to the property through the freezing of the water in the pipes in the winter season, and that no complaints in reference to the want of water had been made to defendant by the occupants of the buildings. This evidence was objected to and excluded. *Held*, no error.

Defendant set up as a defense that the order could not be complied with except by the expenditure of considerable money, and as the order was made without notice its effect was to deprive defendant of its property without a hearing or opportunity to present any defense, and so that it deprived defendant of its property without due process of law. *Held*, untenable.

Defendant claimed that the statutory provision does not authorize the notice given requiring appliances to furnish "a supply of water for domestic use." *Held*, untenable; that the provision necessarily requires some appliances to supply the water; and that it was within the intent of the provision to provide water for the use of the families occupying the tenement houses, and this necessarily includes a sufficient supply for domestic use.

(Argued January 15, 1895; decided February 26, 1895.)

APPEAL from order of the General Term of the Court of Common Pleas for the city and county of New York, made January 4, 1892, which sustained exceptions taken by defendant to a verdict in favor of plaintiff directed by the court and granted a new trial.

The action was brought by the plaintiff, by virtue of several acts of the legislature giving it power in certain cases to commence an action in its own name, for the purpose of recovering the amount of $200, being the penalty for twenty days violation by the defendant of the act here-inafter mentioned, relative to the supply of water in several tenement houses owned by the defendant. The defendant denied some of the allegations of the complaint, and set up also, as one of the defenses to the action, that the statute upon which the complaint is founded is unconstitutional. Each party moved after the evidence was in that a verdict be directed in its favor. The motion on the part of the plaintiff was granted, and that on the part of the defendant was denied. The defendant excepted to these decisions, and the court directed defendant's exceptions to be heard in the first instance at the General Term and that judgment upon the verdict for the plaintiff be in the meantime suspended. The General Term sustained defendant's exceptions and made an order granting a new trial and from that order the plaintiff appeals here.

The cause of action is founded upon section 663 of the Consolidation Act relating to the city of New York, as such section was amended by chapter 84 of the Laws of 1887. After making various provisions in prior sections for the proper construction and ventilation of tenement houses in the city of New York, the legislature, by the amendment of 1887, enacted as follows:

"§ 663. Every such house erected after May 14th, 1867, or converted, * * * shall have Croton or other water furnished in sufficient quantity at one or more places on each floor, occupied or intended to be occupied by one or more families; and all tenement houses shall be furnished with a like supply of water by the owners thereof whenever they shall be directed so to do by the board of health. But a failure in the general supply of water by the city authorities shall not be construed to be a failure on the part of the owner, provided that proper and suitable appliances to receive and distribute

such water are placed in said house. Provided, that the board of health shall see to it that all tenement houses are so supplied before January first, eighteen hundred and eighty-nine."

The rest of the section is not material.

It appeared upon the trial that the defendant was the owner of certain houses in the city of New York known as numbers 59, 77, 84 and 86 Charlton street, and on the 20th of March, 1891, the plaintiff caused to be served on the agent of the defendant a notice requiring the defendant in conformity with the provisions of the Sanitary Code, to alter, repair, cleanse and improve the premises above mentioned, and directing that suitable " appliances to receive and distribute a supply of water for domestic use be provided on the top floor of No. 59, the basement, first and second floors of No. 77, the basement, first, second and third floors of No. 84, and the basement and attic of 86 ; " and the defendant was required to comply with the requirements within five days from the receipt of the notice, and it was also stated in the notice that any application for a necessary extension of time or for the suspension of any part of the requirements contained in the written notice should be made to the health department at the time and place designated in the notice. This action was brought against defendant as owner of houses Nos. 77 and 84 Charlton street. The defendant claims that the houses in question were not tenement houses as that word is popularly used ; that they were houses constructed many years ago as dwelling houses, and they have never been altered with reference to their internal arrangement so as to convert them into what would popularly be called tenement houses. They were old-fashioned dwelling houses, two-story, attic and basement. There were hydrants in the back yards accessible to all tenants of the houses ; but the proof in the case shows that at No. 77 Charlton street there were three families, and in No. 84 there were six families, and the houses came clearly and distinctly under the definition of tenement houses, as enacted by section 666 of the Consolidation Act, as amended by the Laws of 1887 (Chap. 84, p. 100). It is claimed on the part of the defendant that the buildings are in

a transition neighborhood which will be shortly required for business structures; that they are not in a neighborhood where all or many of the large buildings which are known as tenement houses in the popular meaning of the word are situated, and that these houses are not really within the reason of the statute. The defendant offered on the trial to give testimony as to the necessary cost of complying with the order of the board of health, which was excluded, and the defendant excepted. Defendant also offered to prove that the introduction of appliances to furnish water on each floor, and the required sinks and waste pipes to connect with the sewer, would cause great danger of injury to the property through the water in the pipes freezing and the pipes bursting in the winter season; also that no complaints had been made to the defendant corporation by the occupants of these houses in reference to the want of water. All this evidence was excluded under the objection of the plaintiff and upon the exception of the defendant.

The General Term of the Common Pleas granted leave to plaintiff to appeal from its order granting a new trial on the ground that a question of law was involved which ought to be reviewed by this court.

*Roger Foster* for appellant.· The statute is a lawful exercise of the police power both for the protection of the health of the community and protection against fire. (Laws of 1884, chap. 448; *Comm.* v. *Roberts*, 155 Mass. 281; *Bancroft* v. *Cambridge*, 126 id. 438; *Trair* v. *B. D. Co.*, 144 id. 523; *Comm.* v. *Abbott*, 160 id. 282; *In re Paul*, 94 N. Y. 497; *People* v. *King*, 110 id. 418; *People* v. *Budd*, 117 id. 1; *In re Jacobs*, 98 id. 98; *People* v. *Ewer*, 141 id. 129; *Ex parte Fiske*, 72 Cal. 125; *Wadleigh* v. *Gilman*, 12 Maine, 403; *King* v. *Davenport*, 98 Ill. 305; *Allen* v. *Taunton*, 19 Pick. 485.) An abundant and accessible supply of water is a necessity for the protection of the health of the community and for protection against fire; and is always the subject of police regulations. (*State* v. *City of Toledo*, 48 Ohio St.

112; *Lombard* v. *Stearns,* 4 Cush. 60.) It is not a taking of property to compel an owner to improve or alter the condition of his property although he is thereby put to some expense. (*Thorpe* v. *R. & B. R. R. Co.,* 27 Vt. 140; *M. & S. R. Co.* v. *Emmons,* 149 U. S. 364; *N. Y. & N. E. R. R. Co.* v. *Bristol,* 151 id. 556; *People ex rel.* v. *B. & A. R. R. Co.,* 70 N. Y. 569; *C. C. & A. R. R. Co.* v. *Gibbes,* 142 U. S. 386; *People* v. *Budd,* 117 N. Y. 1; *In re Goddard,* 16 Pick. 504; *Davidson* v. *City of New Orleans,* 96 U. S. 97, 106; *Wurts* v. *Hoagland,* 114 id. 606; *Donnelly* v. *Debuer,* 58 Wis. 461; *Norfleet* v. *Cromwell,* 70 N. C. 634; *Anderson* v. *Kerns,* 14 Ind. 199; *O'Reilly* v. *K. V. D. Co.,* 32 id. 169; *Draining Comrs. Case,* 11 La. Ann. 338; *Williams* v. *Mayor, etc.,* 2 Mich. 560; *Sessions* v. *Crinkleton,* 20 Ohio St. 349; *Dingley* v. *City of Boston,* 100 Mass. 544; *Bancroft* v. *City of Cambridge,* 126 id. 438; *Hadgar* v. *Suprs.,* 47 Cal. 222; *French* v. *Kirkland,* 1 Paige, 117; *Phillips* v. *Wickham,* Id. 590; *Woodruff* v. *Fisher,* 17 Barb. 224; *Vanderbilt* v. *Adams,* 7 Cow. 349; *Wadleigh* v. *Gilman,* 12 Maine, 403; *Cordes* v. *Miller,* 39 Mich. 581; *Mugler* v. *Kansas,* 123 U. S. 623; *Rideout* v. *Knox,* 148 Mass. 368.) The General Term erred in supposing that they were bound by the evidence on the trial, and must determine from it alone, whether the statute tended to promote the health of the residents in the houses. (*Walnut* v. *Wade,* 103 U. S. 683.) The act is not unconstitutional because of its failure to expressly direct that the owner of a tenement shall be given notice and a hearing before he is ordered to connect his building with the Croton water pipes. (*Stuart* v. *Palmer,* 74 N. Y. 183; *Spencer* v. *Merchant,* 100 id. 585; *C. & G. T. R. Co.* v. *Wellman,* 143 U. S. 339.) If notice was necessary it will be presumed that it was given. (*Paulser* v. *Portland,* 149 U. S. 30.) The order was sufficient. (Laws of 1882, chap. 410, § 663.) In case of doubt the court will sustain the constitutionality of the statute. (*People* v. *Budd,* 117 N. Y. 1, 29.) Should this court be of the opinion that, on account of any technical insufficiency in

the proof there was error upon the trial, we urge that it express its opinion on the constitutionality of the statute, in order that the public health may no longer suffer by the inability of the plaintiffs to enforce it. (*People ex rel. v. D'Oench,* 111 N. Y. 359, 361; *Minor* v. *Happersett,* 21 Wall. 162.)

*S. P. Nash* for respondents. The acts of the legislature which impose the duty of supplying water on each floor of the houses described cannot be sustained as a proper exercise of police power. (*Village of Carthage* v. *Frederick,* 122 N. Y. 268; *People* v. *Gilson,* 109 id. 389; *People* v. *Marx,* 99 id. 377; *People* v. *Arensberg,* 125 id. 123; *In re Jacobs,* 98 id. 98; *City of Rochester* v. *Simpson,* 57 Hun, 36.) It is sometimes said that legislation which is ostensibly in the interest of public health will be presumed to be so. This is not a legal presumption, and all that can reasonably be meant by it is that the courts will not declare laws supposed to have been passed in the proper exercise of the police power unconstitutional, unless it is plain that they are not within such power. (*In re Jacobs,* 98 N. Y. 98; 128 id. 55; Laws of 1882, chap. 410, § 663; Laws of 1893, chap. 189.) But assuming that the legislation is valid, and that the houses in question are within its terms, the penalties imposed were not recoverable. (*People* v. *Bd. of Health,* 58 Hun, 595.) That the general effect of the legislation under consideration is simply to take the property of one person for the benefit of another is apparent from the uses to which the penalties imposed are to be devoted. (Laws of 1882, chap. 410, §§ 194, 665.) The legislation under review is a burden imposed upon landlords for the ease and comfort of tenants and clearly in violation of constitutional guaranties. (*Foster* v. *Scott,* 136 N. Y. 577.)

PECKHAM, J. The recovery in this case is founded upon that portion of the Consolidation Act which requires that all houses of a certain description, upon the direction of the board of health, shall be provided with Croton or other water in

sufficient quantity at one or more places on each floor, occupied, or intended to be occupied, by one or more families. The defendant, among other things, alleges as a defense that the order of the board of health directing the defendant to furnish the water as provided by the statute was made without notice to it, and that, as it could not be complied with excepting by the expenditure of a considerable amount of money, the result would be to deprive the defendant of its property without a hearing and an opportunity to show what defense it might have, and that it in fact deprived the defendant of its property without due process of law. There was no arrangement in either of these houses in question for the supplying of the Croton or other water to the occupants of each floor at the time when the order of the board of health was made; such order could not, therefore, be complied with on the part of the defendant without the expenditure of money for that purpose. That fact must be assumed, and even upon that assumption we do not think the act is invalid on the alleged ground that it deprives the defendant, if enforced, of its property without due process of law. The act must be sustained, if at all, as an exercise of the police power of the state. It has frequently been said that it is difficult to give any exact definition which shall properly limit and describe such power. It must be exercised subject to the provisions of both the Federal and State Constitutions, and the law passed in the exercise of such power must tend in a degree that is perceptible and clear towards the preservation of the lives, the health, the morals or the welfare of the community, as those words have been used and construed in many cases heretofore decided. Numerous cases have arisen in this state where the power of the legislature was questioned, and where the exercise of that power was affirmed or denied for the reasons given therein. (See *People* v. *Marx*, 99 N. Y. 377; *Matter of Jacobs*, 98 id. 98; *People* v. *Gillson*, 109 id. 389; *People* v. *Arensberg*, 105 id. 123, and many cases cited in these cases. See, also, *Slaughter House Cases*, 16 Wall. 36, 62; *Barbier* v. *Connolly*, 113 U. S. 27; *Gas Co.* v. *Light Co.*,

115 id. 650; *Boston Beer Co.* v. *Massachusetts*, 97 id. 25.) The act must tend in some appreciable and clear way towards the accomplishment of some one of the purposes which the legislature has the right to accomplish under the exercise of the police power. It must not be exercised ostensibly in favor of the promotion of some such object while really it is an evasion thereof and for a distinct and totally different purpose, and the courts will not be prevented from looking at the true character of the act, as developed by its provisions by any statement in the act itself or in its title showing that it was ostensibly passed for some object within the police power. The court must be enabled to see some clear and real connection between the assumed purpose of the law and the actual provisions thereof, and it must see that the latter do tend in some plain and appreciable manner towards the accomplishment of some of the objects for which the legislature may use this power.

*First.* Assuming that this act is a proper exercise of the power in its general features we do not think that it can be regarded as invalid because of the fact that it will cost money to comply with the order of the board for which the owner is to receive no compensation or because the board is entitled to make the order under the provisions of the act without notice to and a hearing of the defendant. As to the latter objection it may be said that in enacting what shall be done by the citizen for the purpose of promoting the public health and safety it is not usually necessary to the validity of legislation upon that subject that he shall be heard before he is bound to comply with the direction of the legislature. (*People ex rel.* v. *Board of Health*, 140 N. Y. 1, 6.) The legislature has power and has exercised it in countless instances to enact general laws upon the subject of the public health or safety without providing that the parties who are to be affected by those laws shall first be heard before they shall take effect in any particular case. So far as this objection of want of notice is concerned the case is not materially altered in principle from what it would have been if the legislature had enacted a general law that all own-

ers of tenement houses should, within a certain period named in the act, furnish the water as directed.    Indeed, this act does contain such a provision, but the plaintiff has not proceeded under it.    If in such case the enforcement of the direct command of the legislature were not to be preceded by any hearing on the part of any owner of a tenement house, no provision of the State or Federal Constitution would be violated.    The fact that the legislature has chosen to delegate a certain portion of its power to the board of health, and to enact that the owners of certain tenement houses should be compelled to furnish this water after the board of health had so directed, would not alter the principle, nor would it be necessary to provide that the board should give notice and afford a hearing to the owner before it made such order.    I have never understood that it was necessary that any notice should be given under such circumstances before a provision of this nature could be carried out.

As to the other objection, no one would contend that the amount of the expenditure which an act of this kind may cause, whether with or without a hearing, is within the absolute discretion of the legislature.    It cannot be claimed that it would have the right, even under the exercise of the police power, to command the doing of some act by the owner of property and for the purpose of carrying out some provision of law, which act could only be performed by the expenditure of a large and unreasonable amount of money on the part of the owner.    If such excessive demand were made the act would without doubt violate the constitutional rights of the individual.    The exaction must not alone be reasonable when compared with the amount of the work or the character of the improvement demanded.    The improvement or work must in itself be a reasonable, proper and fair exaction when considered with reference to the object to be attained.    If the expense to the individual under such circumstances would amount to a very large and unreasonable sum, that fact would be a most material one in deciding whether the method or means adopted for the attainment of the main object were or were not an unreason-

able demand upon the individual for the benefit of the public. Of this the courts must, within proper limits, be the judges. We may own our property absolutely and yet it is subject to the proper exercise of the police power. We have surrendered to that extent our right to its unrestricted use. It must be so used as not improperly to cause harm to our neighbor, including in that description the public generally. There are sometimes necessary expenses which inevitably grow out of the use to which we may put our property and which we must incur, either voluntarily or else under the direction of the legislature, in order that the general health, safety or welfare may be conserved. The legislature, in the exercise of this power, may direct that certain improvements shall be made in existing houses at the owners' expense, so that the health and safety of the occupants and of the public through them may be guarded. These exactions must be regarded as legal so long as they bear equally upon all members of the same class and their cost does not exceed what may be termed one of the conditions upon which individual property is held. It must not be an unreasonable exaction either with reference to its nature or its cost. Within this reasonable restriction the power of the state may, by police regulations, so direct the use and enjoyment of the property of the citizen that it shall not prove pernicious to his neighbors or to the public generally. The difference between what is and what is not reasonable, frequently constitutes the dividing line between a valid and void enactment by the legislature in the exercise of its police power. In commenting on the difference of degree in any given case which would render an act valid or otherwise, Mr. Justice HOLMES, in *Rideout* v. *Knox*, speaking for the Supreme Court of Massachusetts, said : " It may be said that the difference is only one of degree ; most differences are when nicely analyzed. At any rate, difference of degree is one of the distinctions by which the right of the legislature to exercise police power is determined. Some small limitations of previously existing rights incident to property may be imposed for the sake of preventing a manifest evil; larger

ones could not be except by the exercise of the right of eminent domain." (148 Mass. 368, 372. See, also, *Miller* v. *Horton*, 152 id. 540, at 547.) The case of *Stuart* v. *Palmer* (74 N. Y. 183) is an example of the exercise of the taxing power of the state and other considerations obtain in such cases.

Laws and regulations of a police nature, though they may disturb the enjoyment of individual rights, are not unconstitutional, though no provision is made for compensation for such disturbances. They do not appropriate private property for public use, but simply regulate its use and enjoyment by the owner. If he suffer injury, it is either *damnum absque injuria*, or, in the theory of the law, he is compensated for it by sharing in the general benefits which the regulations are intended and calculated to secure. (1 Dillon on Mun. Corp. [4th ed.] sec. 141 and note 2; *Com.* v. *Alger*, 7 Cush. 83, 84, 86; *Baker* v. *City of Boston*, 12 Pick. 184, 193; *Clark* v. *Mayor of Syracuse*, 13 Barb. 32, 36.) The state, or its agent in enforcing its mandate, takes no property of the citizen when it simply directs the making of these improvements. As a result thereof the individual is put to some expense in complying with the law, by paying mechanics or other laborers to do that which the law enjoins upon the owner, but so long as the amount exacted is limited as stated, the property of the citizen has not been taken in any constitutional sense without due process of law.

Instances are numerous of the passage of laws which entail expense on the part of those who must comply with them and where such expense must be borne by them without any hearing or compensation because of the provisions of the law. (*Thorpe* v. *R. R. Co.*, 27 Vt. 140–152.) One of the late instances of this kind of legislation is to be found in the law regulating manufacturing establishments. (Laws of 1887, chap. 462.) The provisions of that act could not be carried out without the expenditure of a considerable sum by the owners of a then existing factory. Hand rails to stairs, hoisting shafts to be inclosed, automatic doors to elevators, automatic shifters for throwing off belts or pulleys, and fire

escapes on the outside of certain factories, all these were required by the legislature from such owner and without any direct compensation to him for such expenditure. Has the legislature no right to enact laws such as this statute regarding factories unless limited to factories to be thereafter built? Because the factory was already built when the act was passed, was it beyond the legislative power to provide such safeguards to life and health as against all owners of such property unless upon the condition that these expenditures to be incurred should ultimately come out of the public purse? I think to so hold would be to run counter to the general course of decisions regarding the validity of laws of this character and to mistake the foundation upon which they are placed. (*Coates* v. *Mayor, etc.,* 7 Cowen, 585; 604; Cooley's Const. Lim. [5th ed.] chap. 16, page 706, etc.)

Any one in a crowded city who desires to erect a building is subject at every turn almost to the exactions of the law in regard to provisions for health, for safety from fire and for other purposes. He is not permitted to build of certain materials within certain districts because though the materials may be inexpensive they are inflammable, and he must build in a certain manner. Theaters and hotels are to be built in accordance with plans to be inspected and approved by the agents of the city; other public buildings also; and private dwellings within certain districts are subject to the same supervision, and in carrying out all these various acts the owner is subjected to an expense much greater than would have been necessary to have completed his building if not compelled to complete it in the manner, of the materials and under the circumstances prescribed by various acts of the legislature. And yet he has never had a hearing in any one of these cases, nor does he receive any compensation for the increased expense of his building, rendered necessary in order to comply with the police regulations. I do not see that the principle is substantially altered where the case is one of an existing building and it is to be subjected to certain alterations for the purpose of rendering it either less exposed to the danger from fires or

its occupants more secure from disease. In both cases the object must be within some of the acknowledged purposes of the police power and such purpose must be possible of accomplishment at some reasonable cost, regard being had to all the surrounding circumstances. There might at first seem to be some difference as to the principle which obtained in enacting conditions upon complying with which the owner might be permitted to erect a structure within the limits of a city or village or for certain purposes, and the enactment of provisions which would necessitate the alteration of structures already in existence. In the first case it might be urged that the discretion of the legislature in enacting conditions for building might be more extensive, because the owner would be under no necessity of building; it would be a matter of choice and not of compulsion, and in choosing to build it might be said that he accepted the condition, while in the second case he would have no choice and would be compelled to alter or improve the existing building as directed by the law. The difference, however, is, as it seems to me, really not one of principle, but only of circumstances. Although the owner in the one case is not compelled to build, yet he is limited in the use to which he may put his property by the provisions of the law. He cannot build as he wishes to, unless upon the condition of a compliance with the law, and he may very probably be so situated as to location of property, and in other ways, that it is really a necessity for him to use his property in the way proposed, and which he cannot do without expending considerable sums above what he otherwise would be called upon to do in order to comply with those provisions. They must, therefore, be reasonable, as already stated. When one's use of his property is thus circumscribed and limited, what might otherwise be called his rights are plainly interfered with, and the justification therefor can only be found in this police power. So, when the owner of an existing structure is called upon to make such alterations, while the necessity may seem to be more plainly present, still it may exist in both cases, and the only justification in either is the same.

Under the police power persons and property are subjected to all kinds of restraints and burdens in order to secure the general comfort and health of the public.

The citizen cannot, under this act, be punished in any way, nor can any penalty be recovered from him for an alleged non-compliance with any of its provisions or with any order of the board of health without a trial. The punishment or penalties provided for in section 665 cannot be enforced without a trial under due process of law, and upon such trial he has an opportunity to show whatever facts would constitute a defense to the charge; to show, in other words, that he did not violate the statute or the order of the board or that the statute itself or the order was unreasonable and illegal. He might show that the house in question was not a tenement house within the provision of the act, or that there was a supply of water as provided for by the act, or any other fact which would show that he had not been guilty of an offense with regard to the act. (*City of Salem* v. *R. R. Co.*, 98 Mass. 431, 447.)

The mere fact, however, that the law cannot be enforced without causing expense to the citizen who comes within its provisions furnishes no constitutional obstacle to such enforcement even without previous notice to and a hearing of the citizen. What is the propriety of a hearing and what would be its purpose? His property is not taken without due process of law, within any constitutional sense when the enforced compliance with certain provisions of the statute may result in some reasonable expense to himself. Any defense which he may have is available upon any attempt to punish him or to enforce the provisions of the law.

An act of the legislature of Massachusetts which provided that every building in Boston used as a dwelling house, situated on a street in which there was a public sewer, should have sufficient water closets connected therewith, was held valid as to existing houses and applied in its penalties to their owners, if such houses continued without the closets after its passage. (*Commonwealth* v. *Roberts*, 155 Mass. 281, and see *Train* v. *Disinfecting Co.*, 144 id. 529.) No notice or

hearing was provided for in the above statute as to water closets before the act could be enforced, and yet to enforce it would, of course, cost the owner of the building some money. The same may be said as to the disinfecting of the rags, in above case in 144 Mass. If the citizen be charged with any violation of such a statute, and any penalty or punishment is sought or attempted, then is.the time for a hearing and then is .the time he can make defense if any he may have. But to assert that he must be heard before the authorities assume or endeavor to act under and to enforce the law as against him, is to say, in substance, that each citizen is to be heard upon the general question whether it is right to enforce the law in his.particular case. This is not to be permitted. (*Com.* v. *Alger*, 7 Cush. 53, 104; *City of Salem* v. *R. R. Co.*, 98 Mass. 431, 443.) Everything that the individual could urge upon the hearing if given prior to the attempted enforcement of the act by the making of the order in question can be said by him when he is sued, or when the attempt is made to punish him for the alleged violation of the law. Upon the prior hearing, if granted, it would be no defense to him if he showed that the law could not be complied with unless at some reasonable expense to himself. That would have been matter to urge upon the legislature prior to the enactment of the statute, as a question of reasonable cost and'of public policy. (*R. R. Co.* v. *Com.*, 79 Me. 386, 393; *The State* v. *R. R. Co.*, 83 Mo. 144–149; *Thorpe* v. *R. R.*, 27 Vt. 140, 149, 156, note.)

We do not think that the cost of making the improvements called for by this act exceeds the limits which have been defined, assuming the amount thereof which the defendant offered to prove.

This is not the case of a proceeding against an individual on the ground of the maintenance of a nuisance by him, nor is it the case of an assumed right to destroy an alleged nuisance without any other proof than the decision of the board itself (with or without a hearing) that the thing condemned was a nuisance. Nor is it the case of the destruction

of property which is in fact a nuisance, without compensation. Where property of an individual is to be condemned and abated as a nuisance it must be that somewhere between the institution of the proceedings and the final result the owner shall be heard in the courts upon that question, or else that he shall have an opportunity when calling upon those persons who destroyed his property to account for the same, to show that the alleged nuisance was not one in fact. No decision of a board of health, even if made on a hearing, can conclude the owner upon the question of nuisance. (*People ex rel.* v. *Board of Health of Yonkers*, 140 N. Y. 1; *Board of Health, etc.,* v. *Copcut*, Id. 12; *Miller* v. *Horton*, 152 Mass. 540; *Hutton* v. *City of Camden*, 39 N. J. Law, 122.) We are, therefore, of the opinion that the act, if otherwise valid, is not open to the objection that it violates either the Federal or State Constitution in the way of depriving the defendant of its property without due process of law.

*Second.* We think the act is valid as an exercise of the police power with respect to the public health and also with respect to the public safety regarding fires and their extinguishment. We cannot say as a legal proposition that it tends only to the convenience of the tenants in regard to their use of water. We cannot say that it has no fair, and plain, and direct tendency towards the promotion of the public health or towards the more speedy extinguishment of fires in crowded tenement houses. That the free use of water, especially during the summer months, tends towards the healthful condition of the body by reason of the increased cleanliness occasioned by such use, there can be no reasonable doubt. The supply of water to the general public in a city has become not only a luxury, but an absolute necessity for the maintenance of the public health and safety. The city of New York itself has spent millions upon millions of dollars for the purpose of securing this great boon for the inhabitants thereof. The right of eminent domain in the taking of land around the sources of the water supply has been granted to and exercised by that city to a very large

extent, so that all sources of supply of this necessity of life should be rendered as free from contamination and danger to health and life as it possibly could be. This use of the water is not confined, so far as the necessities of the case are concerned, to the public hydrants. The water is brought into the city so that it may be used in every house and building within its limits, and, although we may, and, indeed, must admit that no health law could practically be enforced which should provide that every individual inhabitant of the tenement houses should use the water, yet we think it is perfectly clear that facilities for the use of the water will almost necessarily be followed by its actual use in larger quantities and more frequently than would be the case without such facilities, and to the great benefit of the health of the occupants of such houses. Those occupants require it more even than their more favored brethren living in airy, larger, more spacious and luxurious apartments. Their health is matter of grave public concern. The legislature cannot in practice enforce a law so as to make a man wash himself ; but, when it provides facilities therefor, it has taken a long step towards the accomplishment of that object. That dirt, filth, nastiness in general, are great promoters of disease, that they breed pestilence and contagion, sickness and death, cannot be successfully denied. There is scarcely a dissent from the general belief on the part of all who have studied the disease that cholera is essentially a filth disease. The so-called ship fever or jail fever arises from filth ; most diseases are aggravated by it. That opportunities, conveniences for the use of water in these tenement houses will unquestionably tend towards and be followed by more cleanly living on the part of the occupants of those houses cannot, it seems to me, admit of any rational doubt ; and, if so, then the law which provides at a reasonable cost for the furnishing of such facilities is plainly and honestly a health law.

The learned counsel for the defendant asks where this kind of legislation is to stop. Would it be contended that the owners of such houses could be compelled to furnish each room with

a bath tub and all the appliances that are to be found in a modern and well-appointed hotel? Is there to be a bath room and water closet to each room and every closet to be a model of the very latest improvement? To which I should answer, certainly not. That would be so clearly unreasonable that no court in my belief could be found which would uphold such legislation, and it seems to me equally clear that no legislature could be found that would enact it. The tenement house in New York is a subject of very great thought and anxiety to the residents of that city. The numbers of people that live in such houses, their size, their ventilation, their cleanliness, their liability to fires, the exposure of their occupants to contagious diseases, and the consequent spread of the contagion through the city and the country, the tendencies to immorality and crime where there is very close packing of human beings of the lower order in intelligence and morals, all these are subjects which must arouse the attention of the legislator and which it behooves him to see to in order that such laws are enacted as shall directly tend to the improvement of the health, safety and morals of those men and women that are to be found in such houses. Some legislation upon this subject can only be carried out at the public expense, while some may be properly enforced at the expense of the owner. We feel that we ought to inspect with very great care any law in regard to tenement houses in New York and to hesitate before declaring any such law invalid so long as it seems to tend plainly in the direction we have spoken of and to be reasonable in its provisions. If we can see that the object of this law is without doubt the promotion or the protection of the health of the inmates of these houses or the preservation of the houses themselves and consequently much other property from loss or destruction by fire, and if the act can be enforced at a reasonable cost to the owner, then in our opinion it ought to be sustained. We believe this statute fulfills these conditions. We think that in this case it is not a mere matter of convenience of the tenants as to where they shall obtain their supply of water. Simple convenience we admit would not author-

ize the passage of this kind of legislation. But where it is obvious that without the convenience of an appliance for the supply of water on the various floors of these tenement houses, there will be scarcely any but the most limited and scanty use of the water itself, which must be carried from the yards below, and when we must admit that the free use of water tends directly and immediately towards the sustaining of the health of the individual and the prevention of disease arising from filth either of the person or in the surrounding habitation, then we must conclude that it is more than a mere matter of convenience in the use of water which is involved in the decision of this case. The absence of the water tends directly towards the breeding of disease, and its presence is healthful and humanizing.

Looked at in the light of a fire law and the act is also valid. The section of the Consolidation Act in question belongs to title 7, which treats of tenement and lodging houses, and various provisions are made in the preceding sections looking towards the prevention and the prompt extinguishment of fires, as well as towards the protection and promotion of the health of the occupants of such houses. And it seems to me that the facility for the extinguishment of fires which would result from the presence of a supply of water on each floor of these houses is plain, and the act must be looked upon as a means for securing such an important result. We are inclined, therefore, to the belief that the act may be upheld under both branches alike as a health law and as one calculated to prevent destruction of property from fires which might otherwise take place.

The act is somewhat vague as to what shall be regarded as a sufficient quantity of water on each floor, but it must have in this respect as in others a reasonable construction, and when an appliance for its supply is placed on a floor where it might be open and common to all those on that floor, and easy of access, and the supply sufficient in amount for general domestic purposes, then and in such case there would be a full compliance with the provisions of the act.

Some criticism is made in regard to the wording of the order of the board of health. The order directed that suitable appliances to receive and distribute a supply of water for domestic use should be provided at these various houses, and it is claimed that there is no language in the act which requires appliances for the distribution of water, nor that the water shall be furnished for domestic use. The act provides that the water shall be furnished in sufficient quantity at one or more places on each floor occupied or intended to be occupied by one or more families. This necessarily requires some appliance for that purpose. The statute must also mean that the water is to be provided for the use of the one or more families that are to be occupants of the floor, and that must include a sufficient quantity of water for domestic purposes.

The provision in the law that the water shall be furnished in sufficient quantities at one *or more* places on each floor cannot be so construed as to leave the number of places of supply entirely to the discretion of the board of health. As the water is to be supplied in sufficient quantity for domestic and not for manufacturing purposes, when that point is reached the law is satisfied. Looking at the purpose of the supply, it is, as I have said, reasonably apparent that one such place on each floor, fairly accessible to all the occupants of the floor, would be all that could usually and reasonably be required, and anything further would be unreasonable, and, therefore, beyond the power of the board to order. The facilities thus given would at the same time furnish the means necessary for obtaining water to extinguish such fires as might accidentally break out and before they had obtained such headway as to render necessary the aid of the fire department. This is clearly a most important safeguard.

The question alluded to in the brief of the respondent's counsel, whether the penalties might not be said to have commenced running immediately after the passage of the amended act of 1887, because of the provision requiring all tenement houses to be supplied with suitable appliances before January 1, 1889, and so have amounted to a confiscation of property,

is not before us, as the proceeding herein was to recover only those incurred since the order was made by the board. If such a case arises where penalties so enormous in amount are claimed, there will probably be not much difficulty in refusing enforcement under the circumstances of that case.

Upon the whole we think the order of the General Term of the Court of Common Pleas should be reversed, and judgment directed to be entered upon the verdict ordered in the trial court, with costs.

BARTLETT, J. (dissenting). I am unable to discover the limit of legislative power if this act is to stand.

Upon the face of the proceeding it is not an exercise of the police power to promote the safety of property by the prevention of fire. The order of the health department served upon the defendant directs that suitable appliances "to receive and distribute a supply of water for domestic use be provided," on certain floors in the houses named.

The act provides that tenement houses "shall have Croton or other water furnished in sufficient quantities at one or more places on each floor," etc.

The order undertakes to construe the act and requires the landlord to distribute a supply of water for domestic use on each floor.

The board of health is not confined to compelling one place on each floor at which water may be obtained, but the act reads "one or more places on each floor;" so that it is left with the board of health to determine how many water faucets upon each floor shall be provided by the landlord for the use and convenience of his tenants. In other words, the legislature seeks to vest in one of the departments of the city government the power to decide the extent of the plumbing in tenement houses for Croton water purposes.

It must, of course, be admitted that water is essential to the public health, and more particularly in crowded tenement districts.

It would undoubtedly be a legitimate exercise of the police

power to compel the introduction of water into tenement houses at some convenient point where all the tenants could obtain an adequate supply, and it may be that the legislature could go so far as to require a faucet upon each floor of the large tenement houses in the public hall in order to encourage the free use of water by enabling the tenants to procure it without too great exertion, but certainly it cannot be possible that the legislature may leave the number and location of faucets on each floor for the domestic use of water to be determined by the board of health. There is no limitation as to whether the faucets shall be in the public hall or in the room of the tenant. To my mind, such an exercise of the police power is spoliation and confiscation under the forms of law; it deprives the landlord of the control of his property and leaves it to a stranger to decide in what manner the house shall be plumbed.

It is a direct interference with the right of the landlord to regulate the rental value of his property.

It is a matter of common knowledge that in rented apartments in the city of New York the convenience and volume of the water supply is regulated by the rental value of the premises, and that in the cheap tenement districts the convenience of the tenants is not and cannot be consulted to the same extent as in first-class localities.

The vice of the act we are considering lies in the fact, already pointed out, that it is too general in its terms and clothes the health department with unlimited and undefined powers.

If it be the legislative intent to compel the introduction of a more abundant supply of water into tenement houses, either to promote the public health or to provide for the timely extinguishment of fires, I think this very proper exercise of the police power should be manifested in an act containing details and limitations, so that capitalists may understand the burdens imposed upon tenement property, and decide, with a full knowledge of the facts, whether they care to embark their money in that class of buildings.

This court has held (*Matter of Jacobs,* 98 N. Y. 108) that the limit of police power " cannot be accurately defined, and the courts have not been able or willing definitely to circumscribe it."

Each case must be decided very largely on its own facts.

A sound public policy certainly dictates that at this time, when the rights of property and the liberty of the citizen are sought to be invaded by every form of subtle and dangerous legislation, the courts should see to it that those benign principles of the common law which are the shield of personal liberty and private property suffer no impairment.

I think the judgment should be affirmed, with costs.

All concur with PECKHAM, J., for reversal, except BARTLETT, J., who reads for affirmance.

Judgment reversed.