PEOPLE v. CRANE.

HEIM v. McCALL et al.   (Nos. 6654, 6655.)

(Supreme Court, Appellate Division, First Department.   December 31, 1914.)

1. CONSTITUTIONAL LAW (§ 38*)—DETERMINATION OF CONSTITUTIONAL QUESTIONS.

   An act of the Legislature is not lightly to be declared invalid, and never unless it is at variance with some definite constitutional provision.

   [Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 36; Dec. Dig. § 38.*]

2. CONSTITUTIONAL LAW (§§ 210, 252*)—DUE PROCESS OF LAW—EQUAL PROTECTION OF LAWS—PERSONS PROTECTED.

   Const. U. S. Amend. 14, providing that no state shall deprive any person of life, liberty, or property without due process of law, nor deny to

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

any person within its jurisdiction the equal protection of the law, protects resident aliens as well as citizens.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 679, 680, 728–731; Dec. Dig. §§ 210, 252.*]

3. CONSTITUTIONAL LAW (§ 238*)—EQUAL PROTECTION OF LAWS—DISCRIMINATION AGAINST ALIENS.

The requirement of Const. U. S. Amend. 14, for equal protection of the laws, forbids discrimination by any state between citizens and resident aliens, based solely on the fact of alienage, so far as concerns the right to enjoy life, liberty, and the pursuit of happiness and to follow any lawful calling.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 688–690, 695, 706–708; Dec. Dig. § 238.*]

4. CONSTITUTIONAL LAW (§ 238*)—EQUAL PROTECTION OF LAWS—DISCRIMINATION AGAINST ALIENS.

The provision of Labor Law (Consol. Laws, c. 31) § 14, that, in the construction of public works by a state or municipality or by contractors, only United States citizens shall be employed, and citizens of the states shall be given preference, denies the equal protection of the laws to resident aliens, contrary to Const. U. S. Amend. 14.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 688–690, 695, 706–708; Dec. Dig. § 238.*]

5. CONSTITUTIONAL LAW (§ 81*)—"POLICE POWER."

An act which invades personal rights or private property cannot be justified under the police power, unless there be some discernible relation between the act and some object of police regulation, since the police power, while its scope and limitations cannot be precisely defined, authorizes only such enactments as are necessary for the protection of the morals, safety, and good order of society.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 148; Dec. Dig. § 81.*

For other definitions, see Words and Phrases, First and Second Series, Police Power.]

6. CONSTITUTIONAL LAW (§ 45*)—DETERMINATION OF QUESTIONS—POWER OF COURTS.

It is within the power of the court to determine whether an act has such relation to the protection of life, health, morals, or welfare as to be sustainable under the police power.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 42; Dec. Dig. § 45.*]

7. MASTER AND SERVANT (§ 11*)—STATUTORY REGULATION—POLICE POWER.

The provision of Labor Law, § 14, that, in the construction of public works by a state or municipality or by a contractor, only citizens of the United States shall be employed, and citizens of New York shall be given a preference, is not a valid exercise of the police power, since it has no possible relation to public health, safety, or morals.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 11.*]

8. MASTER AND SERVANT (§ 11*)—STATUTORY REGULATIONS—ALIENS.

Nor can the law be sustained by analogy to the requirements of the Constitution and laws that public officers, who are a part of the political structure of the state, must be citizens.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 11.*]

9. MASTER AND SERVANT (§ 11*)—STATUTORY REGULATION—PUBLIC WORKS.

Nor was the enactment of that statute authorized under the power of the state to determine with whom it will contract or permit dependent subdivisions to contract, since that power cannot be exercised contrary to the provisions of the Constitution.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 11.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

10. STATUTES (§ 63*)—EFFECT OF INVALIDITY—CONTRACTS.

A provision in a contract for the construction of a public improvement for a city that only citizens shall be employed as laborers, as required by Labor Law, § 14, which is unconstitutional, is not binding upon the contractors, since it was inserted in the contract solely in obedience to that invalid law, and itself violated rights protected by the Constitution.

[Ed. Note.—For other cases, see Statutes, Dec. Dig. § 63;* Constitutional Law, Cent. Dig. § 47.]

Appeals from Court of Special Sessions and Special Term, New York County.

Clarence A. Crane was convicted of employing aliens as laborers in performance of the contract for the construction of a municipal sewer, and he appeals. William Heim brought a taxpayer's action against Edward E. McCall and others and the Cranford Company and others, to restrain defendants McCall and others from declaring void contracts between the Public Service Commission and the Cranford Company and others for the construction of rapid transit subways. From a judgment sustaining a demurrer to the complaint (150 N. Y. Supp. 492), the plaintiff and the defendants Cranford Company and others appeal. The appeals in the two cases were heard together, and the judgment of conviction against defendant Crane reversed, and the defendant discharged, and judgment sustaining demurrer to the complaint of Heim reversed, and judgment directed for the relief demanded.

Argued before INGRAHAM, P. J., and McLAUGHLIN, SCOTT, DOWLING, and HOTCHKISS, JJ.

Edward M. Grout, of New York City, for appellant Clarence A. Crane.

Robert S. Johnstone, of New York City (George Z. Medalie, of New York City, on the brief), for the People.

Thomas F. Conway, of New York City, for appellant Heim.

Edward M. Grout, of New York City, for appellants Cranford Co. and others.

George S. Coleman, of New York City, for respondents Public Service Commission.

Jeremiah A. O'Leary, of New York City, for John Gill, amicus curiæ.

SCOTT, J. Both of these appeals call in question the validity of the same statute. They were argued at the same time and can be conveniently considered together. The statute to which our consideration is thus invited is that portion of section 14 of the Labor Law which reads as follows:

"In the construction of public works by the state or a municipality, ·or by persons contracting with the state or such municipality, only citizens of the United States shall be employed; and in all cases where laborers are employed on any such public works, preference shall be given citizens of the state of New York."　°

A violation of this act is made a misdemeanor, and it is provided that, in all contracts for the construction of public works, a provision shall be inserted to the effect that, if the provisions of this section are not complied with, the contract shall be void.

The appellant Clarence A. Crane was convicted of a misdemeanor for violation of the statute in that he employed aliens as laborers in the performance of a contract executed by the president of the borough of Manhattan for the construction of a catch basin in connection with the public sewer system. The appellant William E. Heim sues as a taxpayer to restrain the Public Service Commission, First District, from forfeiting or declaring void a large number of contracts, now in course of performance, for the construction of the rapid transit subways in the city of New York, because of the employment (which is admitted) of laborers who are not citizens of the United States, and who are not citizens of the state of New York. As justification for his actions, this appellant alleges that the forfeiture of these contracts would result in irreparable loss and damage to the city of New York and the taxpayers thereof, and he states at some length his reasons for this allegation. Certain contractors, holding contracts for the work referred to, are made parties defendant; and, while they do not appear to have served any pleadings, they unite in asking that relief be granted as demanded by the appellant Heim.

With regard to the last-mentioned appeal, we are not unmindful of the recent expressions of the Court of Appeals adverse to the maintenance of so-called taxpayers' actions to test the validity of legislative acts. Schieffelin v. Komfort, 212 N. Y. 520, 106 N. E. 675. In the present case, however, this objection is not raised by the respondents, and since it is represented to us that the matter is one of great public exigency, as to which all parties interested seem to desire a speedy determination, we have concluded to pass upon the appeal upon its merits.

[1] The particular provision of the act above quoted which has been discussed at bar is that which forbids the employment by persons engaged in the performance of work, under contracts with the state or a municipality, of any except citizens of the United States, and it is that feature of the act to which we shall direct our attention, and we shall commence our discussion by conceding, as is strongly urged upon us by the respondents, that the invalidity of an act of the Legislature is not to be lightly declared, and that, in order to find such an act invalid upon constitutional grounds, some definite provision must be found in the fundamental and paramount law with which the questioned enactment is at variance.

[2] The specific constitutional provision which is claimed to have been violated by the act in question is that portion of the fourteenth amendment of the Constitution of the United States which reads as follows:

"No state shall make or enforce any law which shall abridge the privileges and immunities of the citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

It is settled law that the amendment is not confined to the protection of citizens, but that its provisions are universal in their application to all persons within the territorial jurisdiction, without regard to any differences of race or color or of nationality, and the promise of the equal protection of the laws is equivalent to a pledge of the protection

of equal laws.　Yick Wo v. Hopkins, 118 U. S. 369, 6 Sup. Ct. 1064, 30 L. Ed. 220.

[3] The rights thus secured to resident aliens, as well as to citizens, have been repeatedly held to extend to the right to contract, to pursue lawful callings, and to follow ordinary avocations, that no impediments should be interposed to the pursuits of any one, except such as are applied to the same pursuits by others under like circumstances.　Barbier v. Connolly, 113 U. S. 27, 5 Sup. Ct. 357, 28 L. Ed. 923.　It was said by the same court in Missouri v. Lewis, 101 U. S. 22, 25 L. Ed. 989, that:

"No person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in the same place and under like circumstances."

And again in Hayes v. Missouri, 120 U. S. 68, 7 Sup. Ct. 350, 30 L. Ed. 578:

"The fourteenth amendment * * * requires that all persons" subject to legislation limited as to the objects to which it is directed, or by the territory within which it is to operate, "shall be treated alike, under like circumstances and conditions, both in the 'privileges conferred and in the liabilities imposed."

Hence it may be said to be as firmly established as is any principle of constitutional law that one of the purposes and effects of the fourteenth amendment of the federal Constitution was to forbid discrimination by any state between citizen and resident aliens, based solely upon the fact of alienage and nonalienage, so far as concerns the right to enjoy life, liberty, and the pursuit of happiness and the equal protection of the laws.　Among the rights guaranteed to every individual is that of freely contracting to render service and perform labor.

"The provisions of the state and of the federal Constitutions protect every citizen in the right to pursue any lawful employment in a lawful manner. He enjoys the uttermost freedom to follow his chosen pursuit, and any arbitrary distinction against, or deprivation of, that freedom by the Legislature is an invasion of the constitutional guaranty." People v. Williams, 189 N. Y. 131, 81 N. E. 778, 12 L. R. A. (N. S.) 1130, 121 Am. St. Rep. 854, 12 Ann. Cas. 798.

[4] That the statutory provision now under consideration is frankly and baldly discriminatory requires no argument to establish.　It forbids the employment of aliens upon all public works within the state for no other reason than that they are aliens.　On its face it appears to be directly in conflict with the fourteenth amendment, but it is strenuously argued by the respondents that for various reasons it does not in truth conflict with the constitutional prohibition.

Much stress is laid by all of the respondents upon the cases which have upheld laws restricting the hours of labor and prescribing the rate of wages to be paid on public work, of which Atkin v. State of Kansas, 191 U. S. 207, 24 Sup. Ct. 124, 48 L. Ed. 148, is the leading case.　We have been referred to and have examined many cases in this and other states dealing with that question, but we find it unnecessary to cite or comment upon them here because they all rest upon

quite different considerations from those which we understand to be controlling upon the precise question we are now discussing. In none of them was the question of discrimination involved in the sense in which it is involved here. This was clearly pointed out by Mr. Justice Harlan, who wrote for the court in Atkin v. Kansas, supra. He said:

"Equally without any foundation upon which to rest is the proposition that the Kansas statute denied to the defendant (a contractor, not a laborer) or to his employé the equal protection of the laws. The rule of conduct prescribed by it applies alike to all who contract to do work on behalf either of the state or of its municipal subdivisions, and alike to all employed to perform labor on such work."

So in People ex rel. Rodgers v. Coler, 166 N. Y. 1, 59 N. E. 716, 52 L. R. A. 814, 82 Am. St. Rep. 605, wherein the Court of Appeals considered a statute of the state regulating the hours of labor and the rate of wages on public work, it is clearly pointed out that the question now under discussion was not involved, and a grave doubt was expressed whether the provision of the statute prohibiting alien labor on the public works of the state could be upheld, if attacked. The court said:

"It is not necessary to inquire how far, if at all, the right of citizens of other states seeking employment here, or those of aliens who have come here to improve their condition and to earn an honest living, are ignored or restricted by this statute. These questions have not been raised or argued, and we will only remark that it reverses the settled policy of this state from the earliest time. The policy of New York has always been to welcome, not only the citizens of our sister states, but emigrants from abroad, to equal participation in all the opportunities and advantages of its business * * * life. If the policy indicated in the statute now under consideration had been formulated and carried into operation half a century earlier, it may be that the growth and progress of the state would not be the subject of so much pride or as gratifying to all the people as it is now."

Our conclusion upon this branch of the subject is that no support for the act now under examination can be found in the cases which have upheld the laws restricting the hours of labor on public work and fixing a minimum rate of pay. All of those cases rest upon considerations which are inapplicable to the present question.

[5] It is sought to sustain the act as an exercise by the state of the police power—that well-recognized but not easily defined power under which the state may and often does restrict the liberty of the individual for the safety and protection of the community. It is not easy, nor is it necessary, to attempt to precisely define the scope and limitations of the police power, but it may be said generally to authorize such enactments as are deemed necessary for the protection of society and to guard its morals, safety, health, and good order, but it is well recognized that, in order to justify an act as an exercise of the police power, there must appear to be some obvious and real connection between the terms of the enactment and some of the purposes for the attainment of which the police power may be exercised. Consequently an act which invades personal rights or private property cannot be justified under the police power, unless there be some

discernible relation between it and some legitimate object of police regulation.

[6] Whether or not any statute can be upheld as a valid exercise of the police power is also a proper subject for judicial inquiry. It was said in Colon v. Lisk, 153 N. Y. 188, 47 N. E. 302, 60 Am. St. Rep. 609:

" 'The Legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations. In other words, its determination as to what is a proper exercise of its police powers is not final or conclusive, but is subject to the supervision of the courts.' Lawton v. Steele, 152 U. S. 133, 137 [14 Sup. Ct. 499, 38 L. Ed. 385]. * * * Whenever the Legislature passes an act which transcends the limits of the police power, it is the duty of the judiciary to pronounce it invalid and to nullify the legislative attempt to invade the citizens' rights. People ex rel. Nechamcus v. Warden, 144 N. Y. 529, 535 [39 N. E. 686, 27 L. R. A. 718]. That power must be exercised subject to the provisions of both federal and state Constitutions. Laws passed in the exercise of it must tend towards the preservation of the lives, health, morals, or welfare of the community, and the court must be enabled to see some clear and real connection between the assumed purpose of the law, and the actual provisions thereof, and that the latter tend in some plain and appreciable manner towards the accomplishment of the objects for which the Legislature may use this power. Health Department v. Rector, 145 N. Y. 32, 39 [39 N. E. 833, 27 L. R. A. 710, 45 Am. St. Rep. 579]."

[7] It seems to be quite clear that the provision of the Labor Law now under consideration cannot be upheld on this ground. As was said by Chief Judge Cullen in discussing a so-called "eight-hour law":

"It seems to me to be entirely clear that the statute cannot be upheld as an exercise of the police power vested in the Legislature. I should think the proposition too plain for debate, but, if this assertion be considered dogmatic, then I say that the question is settled by the decisions both of this court and the Supreme Court of the United States. While the field for the exercise of the police power, subject to which all property is possessed by the citizen and all his callings or vocations must be pursued, is very broad—so broad that no court has sought to define accurately its extent—still it is subject to recognized limitations." People v. Orange County Road Construction Co., 175 N. Y. 84–87, 67 N. E. 129 (65 L. R. A. 33).

In a later case the Court of Appeals, while sustaining the validity of an eight-hour law, said:

"We do not uphold the Labor Law as constitutional to the limited extent that we pass upon it at all, because it is authorized by the police power which belongs to the state, for we cannot see that it bears any reasonable relation to the public health, safety, or morals." People ex rel. Williams, etc., v. Metz, 193 N. Y. 148–159, 85 N. E. 1070, 1074 (24 L. R. A. [N. S.] 201).

We, too, are unable to see how the public health, safety, or morals can be affected by the citizenship or alienage of laborers upon the subways, or upon other work of a similar character. It is true that in certain cases, and with reference to certain occupations, it has been held to be lawful, under the police power, to discriminate between citizens and aliens, but the very cases in which it has been so held, and the reasons given for so holding illustrate their inapplicability to the present case. Thus in Commonwealth v. Hana, 195 Mass. 262, 81 N. E. 149, 11 L. R. A. (N. S.) 799, 122 Am. St. Rep. 251, 11 Ann.

Cas. 514, an act was upheld that prohibited the issuance of peddlers' licenses to any person except citizens or those who had declared their intention to become citizens. A similar act had been held unconstitutional in Maine. State v. Montgomery, 94 Me. 192, 47 Atl. 165, 80 Am. St. Rep. 386. The Supreme Court of Massachusetts, however, sustained the act in that state on the ground that the Legislature might have discovered a reason for passing the act because:

"The business of peddling furnishes such opportunities for the practice of fraud that it is a proper subject for legislative regulation;" and "that such regulation has been practiced from early times, both in Europe and America, is shown at length by Mr. Justice Gray in Emert v. Missouri, 156 U. S. 296 [15 Sup. Ct. 367, 39 L. Ed. 430]."

In the course of its opinion the court quoted the fourteenth amendment, and said:

"It is decided that this provision applies to aliens as well as to citizens of the United States, and it is clear that a statute arbitrarily forbidding aliens to engage in ordinary kinds of business to earn their living would be unconstitutional and void."

So, also, statutes have frequently been upheld which discriminated in favor of citizens as against aliens in the matter of granting licenses to trade in liquor, but the relation of the liquor traffic to the health, morals, and good order of the community is obvious and has been recognized from the earliest times, and this relation has been the reason given for the discrimination. It is quite true that classification is not necessarily unlawful discrimination, and that the state has broad powers of classification for the purposes of legislation, but, to be lawful, such classification must have some reasonable basis to rest upon and must not be arbitrary or capricious or founded on mere whim. People ex rel. Farrington v. Mensching, 187 N. Y. 8–16, 79 N. E. 884, 10 L. R. A. (N. S.) 625, 10 Ann. Cas. 101; Gulf, Colorado & Santa Fé Ry. v. Ellis, 165 U. S. 150, 17 Sup. Ct. 255, 41 L. Ed. 666.

It would certainly be anomalous and illogical to uphold on this ground a statute or classification based upon the precise discrimination which is forbidden by the fourteenth amendment, and having no other discernible basis.

[8] It is also sought to sustain the act by drawing a supposed analogy between it and the numerous enactments, constitutional and legislative, which require that public officers shall be citizens. It is plain that there is no such analogy. Public officers are a part of the political structure of the state, and there is a clear distinction between them and laborers, and an even more clear distinction between them and the laborers employed by an individual contractor, even when engaged upon public work.

[9] It is also argued that the state has the right to determine with whom it will contract or permit its constituent subdivisions to contract, and has also the right to prescribe terms which such contracts shall contain. This is true, however, only if the terms prescribed are not such as violate the fundamental and paramount law to which even the state is subject.

[**10**] It is also argued that, since each of the contractors have signed the contracts containing the restrictive clause, they cannot be heard to object to its enforcement. The contractors, however, are not the only persons to be affected. The alien laborers, for whose protection, among others, the fourteenth amendment was adopted, and who have come to this country relying upon its promise of equal opportunity, are vitally interested that its protection shall not be denied them. But, even if we consider the contractors alone, the argument fails. It appears upon the face of the contracts themselves that the restrictive clause was imported into them solely in obedience to the requirements of the Labor Law. The rule in such cases is that the restrictive clause and the penalty provided for its violation both become inoperative if the statute prescribing them is held to be invalid. Home Ins. Co. v. Morse, 87 U. S. (20 Wall.) 445–458, 22 L. Ed. 365; People ex rel. Rodgers v. Coler, 166 N. Y. 1, 59 N. E. 716, 52 L. R. A. 814, 82 Am. St. Rep. 605.

We have heard and considered various arguments dealing with the sociological aspects of the case, and others dealing with somewhat far-fetched suppositions as to the dire results that might be expected from the employment of aliens in constructing the subways in case this country should ever, unhappily, be engaged in war with some foreign country. Such arguments, in our opinion, afford no assistance in the solution of what is purely a legal question.

Our conclusion, therefore, is that the provisions of section 14 of the Labor Law, quoted earlier in this opinion, are violative of the fourteenth amendment of the Constitution of the United States, and therefore void. Our attention has been called to the text of numerous treaties between the United States and foreign countries which, as it is claimed, expressly forbid discriminating legislation of this character. In view of the conclusion we have reached upon the constitutional question, it is unnecessary to discuss any question arising under these treaties.

An interesting question has been raised as to whether or not the clause quoted from the Labor Law applies to the work of building subways for the rapid transit system in the city of New York. It seems to be conceded by all of the respondents that it would be incompetent for the Legislature to impose upon private persons or corporations, not engaged in performing public work, such restrictions as are attempted to be imposed upon the city of New York as an arm of the state. This assumption opens up a wide field for inquiry upon which we do not propose to enter, and it is not necessary to do so, because the act by its own terms is made applicable only to the construction of public works. The contention is that the construction of the subways is a private work undertaken by the city of New York in its proprietary character, and not a public work undertaken by the city as the alter ego of the state in its sovereign capacity. It is quite true that, generally speaking, municipalities are considered as merely the creatures of the state, and its auxiliaries for the purpose of local government. This view was elaborated in Atkin v. Kansas, supra. The city of New York, however, is different from many cities in this: That it

possesses, under its ancient charters and patents, much private property which it holds, not as a part of the sovereign, but as a proprietor; and there is a clear distinction between work undertaken by the city as the delegate of the state and that undertaken by it in its private or corporate capacity, which it may undertake or not as it sees fit, and to undertake which it cannot be coerced by the Legislature. In the one case the city acts as a political subdivision of the state; in the other as a private and independent contractor. The building of the subway appears to fall within the latter class. The city's relation thereto has recently been stated by the Court of Appeals as follows:

"Was the action of the city in building the subway governmental or proprietary in character? The city owns the subway, and it is a railroad corporation, so far as the construction, operation, and leasing thereof is concerned. It was not required, but simply permitted, to build and operate the road; * * * in other words, the subway is a business enterprise of the city, through which money may be made or lost, the same as if it were owned by an ordinary railroad corporation. It was built by and belongs to the city as a proprietor, and not as a sovereign." Matter Rapid Transit Commissioners, 197 N. Y. at page 96, 90 N. E. at page 460 (36 L. R. A. [N. S.] 647, 18 Ann. Cas. 366).

In view of this language, there is much ground for saying that even if the state could lawfully impose the test of citizenship upon employés of its own contractors, and the contractors with the city engaged in what is properly state work, it has no more power to impose such a test upon persons employed in building a subway for the city than it would have if the subways were being constructed by a private corporation or individual.

We do not consider it necessary to expand this opinion by a prolonged discussion of this interesting question, since the conclusion at which we have arrived upon the other branch of the case necessitates a reversal of the judgments appealed from.

The judgment of conviction against the defendant Crane will therefore be reversed, and the defendant discharged. The judgment sustaining the demurrer to the complaint of the appellant Heim will be reversed, and the demurrer overruled, with costs to said appellant in this court and the court below, and judgment directed for the relief demanded in the complaint. All concur.

INGRAHAM, P. J. I fully concur in the opinion of my Brother SCOTT that section 14 of the Labor Law is a violation of both the federal and state Constitutions.

As to the second question raised, I do not think that this section of the Labor Law applies to contracts made by the city of New York to build the subways which are described in the complaint in this action. The question, it seems to me, is not whether the Legislature had power to regulate the method by which the municipal corporation of the city of New York should carry on its work or make its contracts for the improvement of the property which it held as a proprietor or owner of such property, but whether the Legislature has attempted to do so. The provision of section 14 of the Labor Law is:

"In the construction of public works, by the state or a municipality or persons contracting with the state or such municipality, only citizens of the United States shall be employed."

This provision relates solely to the construction of public works, and, in the construction of such public works, the evident intention was to limit the power of the state or a municipality or any persons contracting with the state or municipality. It was conceded that the city of New York has large interests which it holds, not as public property in the sense which such property is held by the state or a municipal corporation for public purposes, but in a strictly proprietary right, and which it is authorized by the Legislature to improve for the benefit of the city and to enable it to receive for the city the profits which will accrue from such improvements. Take the case of the docks and wharves that the city owns and has improved and rents to those engaged in the commerce of the port, receiving for the use of the municipal corporation the rents or emoluments paid for their use. As to a contract to build such a dock or structure thereon, I think it could well be said that it was not a public work in which the city was engaged, but rather a private work for the benefit of the municipality, as distinct from a work for the benefit of the public at large. So as to many other contracts which the city is authorized to make for the improvement of its property and for the enhancement of its revenue. And it seems to me clear that the building of these subways is within this class. The city is not building these subways for the benefit of the people of the state, but for the benefit of the municipal corporation, and it owns such subways, and they are operated, not as public works, but as the private property, of the city. It is authorized to lease these subways when built to a private corporation. All the public are excluded from the subways or the benefits that flow from their construction and operation, except upon the payment of a fee charged, a percentage of which is paid to the city, and, at the expiration of the term for which they are leased, the property reverts absolutely to the city to be a part of its private property. Matter of Board of Rapid Transit Commissioners, 197 N. Y. 96, 90 N. E. 456, 36 L. R. A. (N. S.) 647, 18 Ann. Cas. 366.

It seems clear, therefore, that, even assuming that the Legislature had power to impose such an obligation upon the city of New York by limiting the prohibition to "public works," such limitation did not apply to work of the character described in the complaint in this action, and therefore the provision of this section of the Labor Law did not apply to the city of New York when building a subway or railroad as a business enterprise of the city.

McLAUGHLIN, J., concurs.