(89 App. Div. 526.)

### TENEMENT HOUSE DEPARTMENT OF CITY OF NEW YORK v. MOESCHEN.

(Supreme Court, Appellate Division, First Department. January 8, 1904.)

1  STATUTES—CONSTITUTIONAL LAW—DETERMINATION—EVIDENCE.
    In a proceeding to determine the constitutionality of a statute affecting the use, maintenance, and operation of tenement houses, the court cannot consider evidence aliunde, but is confined to the consideration of the law itself, and facts and circumstances surrounding it, of which the court can take judicial notice.

2. SAME—ABOLITION OF SCHOOL SINKS—POLICE POWER.
    Laws 1901, p. 912, c. 334, § 100, as amended by Laws 1902, p. 937, c. 352, § 47, requiring that for all present school sinks in tenements there shall be substituted another and different system of sewerage, and that such school sinks shall not thereafter be maintained, etc., is a proper exercise of the state's police power for the preservation of the public health, and is therefore not unconstitutional, as a deprivation of the property of a tenement house owner without due process of law.

3. SAME—ENFORCEMENT.
    It was no defense to the enforcement of such act that the cost of changing the plumbing in defendant's tenement house thereunder would equal or exceed her equity in the property.

Appeal from Special Term, New York County.

Suit by the Tenement House Department of the City of New York against Katie Moeschen. From an order (85 N. Y. Supp. 19) directing a mandatory injunction against defendant, she appeals. Affirmed.

The defendant is the owner in fee of a tenement house accommodating 20 families, located at No. 332 East Thirty-Ninth street, New York City, valued at $16,500, her equity therein being $3,500. She has failed to comply with the provisions of the tenement house act (chapter 334, p. 889, Laws 1901), which went into effect on April 12, 1901, in that she has not, since that time, as directed by section 100 of the law, removed a school sink upon the premises, and substituted therefor "individual water-closets of durable nonabsorbent material properly sewer-connected," which changes, it appears, would entail an expense of from $750 to $2,800. An action was brought against the defendant by the plaintiff in a Municipal Court of the city for the recovery of the civil penalty of $50, which the act provides for failure to comply with its provisions, and in such action the issues were tried before a jury as to the facts involved, and a verdict rendered against the defendant. Thereafter the present suit was commenced by the plaintiff, the complaint restating defendant's violation of the statute, and pleading the former adjudication, and judgment was asked restraining the defendant from further maintaining the school sink upon her premises, and directing her to provide in place thereof the closets specified in the act. The defendant, in her answer, admitted her failure to comply with the provisions of the act, and likewise all of the substantial allegations of the complaint, save the ninth, which contains the averment "that said violations impair the public health and safety"; and as a defense pleaded that the law is null and void, because enacted in violation of the provisions of the Constitution of the state of New York and the Constitution of the United States, in that it imposes an unreasonable and improper exaction, which operates to deprive the defendant of her property

---

¶ 1. See Constitutional Law, vol. 10, Cent. Dig. § 12.

without due process of law, and without making compensation to her therefor, and in that it authorizes and directs the taking of private property not for public use, and operates to deprive the defendant of the rights and privileges secured to her as a citizen of the state of New York and the Constitution of the United States in that she is thereby deprived of her liberty and the privilege of pursuing a lawful avocation, the act not promoting or seeking to promote public health, morals, or safety, but effecting a confiscation and spoliation of her property, and being such that the compliance therewith is impossible, and would involve upon defendant an extraordinary, excessive, and unreasonable expense in attempting performance in that the amount of said expense is not warranted by the value of the property or of defendant's equity therein, nor by the nature of the work required by the statute. The answer further avers that the defendant has always maintained the premises in a sanitary condition, and in compliance with ordinances and regulations, and that the said school sink was constructed under the supervision of the proper department of the city of New York, under plans duly approved and in accordance with and in obedience to an order of the board of health of the city, and in complying with said order the defendant's predecessor was put to great expense in removing the privy vault theretofore contained in said premises and constructing the school sink. The plaintiff, upon the pleadings and affidavits, obtained an order to show cause why an order should not be granted pursuant to the tenement house act enjoining the defendant from maintaining the school sink and directing the substitution therefor of water-closets as specified in the act. Thereupon a large number of affidavits were submitted by both parties bearing upon the conditions of the school sink of the defendant and other school sinks in the city, and whether or not they were unsanitary, and whether or not the proposed changes were feasible and reasonable. The Special Term granted the plaintiff's motion for an order enjoining the defendant from maintaining the sink in question and directing her to substitute therefor individual closets of the form required by the act, but stayed further proceedings pending the determination of the issues by this court. From the order thus entered, the defendant has appealed.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, PATTERSON, O'BRIEN, and LAUGHLIN, JJ.

Adolph Bloch, for appellant.
Matthew C. Fleming, for respondent.

O'BRIEN, J. In the disposition of the legal question presented for our consideration we are not required to pass upon questions of fact as to whether or not one kind of water-closet is better than another, or whether or not, under certain conditions and manner of use, a particular owner might be able by means of a school sink to keep his property in a sanitary condition, because these are all considerations to be addressed to the Legislature, or to the tenement house commission, to whom the Legislature has relegated the determination of such questions. In the discussion upon which we enter, therefore, we shall not concern ourselves with the dispute which apparently exists among experts as to the best kind of water-closets for tenement houses. The question presented is not one of administration, but one of power. We must primarily determine whether the Legislature has power to regulate and legislate upon the subject of plumbing and closets in tenement houses. If the Legislature has the authority under the police power, with which it is invested, to regulate the entire subject, then, unless the court can see that there has been such a gross and unreasonable exercise thereof as to render its action unconstitutional, we are powerless to intervene.

The single question which we are to determine is whether that portion of the tenement house act (section 100, c. 334, p. 912, Laws 1901, as amended by section 47, c. 352, p. 937, Laws 1902) which requires that for present school sinks in tenements there shall be substituted another and different system of sewerage is or is not constitutional. The tenement house act is the culmination of legislative enactments extending over a long period, directed to providing safe and sanitary conditions particularly among those who live in the more crowded districts of large cities in the state. Prior to its passage the subject of suitable sanitary accommodations for tenement houses was controlled by section 653 of the consolidation act (chapter 410, p. 182, Laws 1882), as amended by chapter 84, p. 96, Laws 1887, which, among other things, provided that:

"Every tenement and lodging house or building shall be provided with as many good and sufficient water closets, improved privy sinks or other similar receptacles as the board of health shall require. * * * The water closets, sinks and receptacles shall have proper doors, soil pipes and traps all of which shall be properly ventilated, * * * and other suitable works and fixtures necessary to insure the efficient operation, cleansing and flushing thereof. Every tenement and lodging house situated upon a lot on a street or avenue in which there is a sewer, shall have a separate and proper connection with the sewer. * * * No privy vault or cesspool shall be allowed in or under or connected with any such house except when it is unavoidable, and a permit therefor shall have been granted therefor by the board of health."

It thus appears that a privy vault in connection with a tenement house such as the defendant's was forbidden, but a school sink, comprising a vault sewer connected and with means for permitting under the direction of a care taker a flow of water at intervals for cleansing, was allowed by and with the assent and supervision of the board of health. The tenement house committee of 1894 having reported adversely upon the condition of the school sinks, and that of 1900 having condemned nearly all of them as being "in a horrible condition, in some cases simply indescribable," and recommended the removal of all school sinks and the substitution therefor of proper water-closet accommodations, the present law was passed, whereby it is provided in section 100 as follows:

"In all now existing tenement houses where a connection with a sewer is possible, all school sinks, privy vaults or other similar receptacles * * * shall before January 1st, 1903, be completely removed and the place where they have been located properly disinfected under the direction of the department charged with the enforcement of this act. Such appliances shall be replaced by individual water closets of durable, nonabsorbent material, properly sewer connected and with individual traps and properly connected flush tanks providing an ample flush of water to thoroughly cleanse the bowl. Each water closet shall be located in a compartment completely separated from every other water closet, and such compartment shall contain a window of not less than three square feet in area opening directly to the outer air. The floors of the water closet compartments shall be waterproof as provided in section 95 of this act. Where water closets are placed in the yard to replace school sinks or privy vaults, long hopper closets may be used; but all traps, flush tanks and pipes shall be protected against the action of frost. In such cases the structure containing the water closet shall not exceed ten feet in height. * * * Such structure shall be provided with a ventilating skylight in the roof of an adequate size. * * * Proper and adequate

means for lighting the structure at night shall be provided. There shall be provided at least one water closet for every two families in every now existing tenement house. * * *"

. The Legislature has thus by these provisions followed up prior enactments, which, upon trial, proved insufficient to fulfill their object of preserving the public health, and by the aid of a special committee, and after extensive investigation, passed an act complete in detail, and designed to cope with the important problems of municipal sanitation. In so doing it has exercised the police power of the state, which, among the many objects over which it extends, applies with peculiar force to the preservation of the general health of the community, and in that connection to the regulation and disposition of sewage. For the prevention of contagion and disease and the suppression of a threatening danger to the public health, the most drastic requirements of the Legislature may, as a proper exercise of this power, be sanctioned, with the limitation merely that they are upon their face no more than reasonable in view of the evil sought to be overcome.

The section of the act from which we have quoted is said to be unconstitutional, however, because, as contended, the result of carrying it into effect will be to unnecessarily burden property owners, and without any corresponding public good in the shape of better sanitation. If it could be concluded from examining the bill itself and its provisions that such would be the consequences flowing from the enactment, then undoubtedly it would be the duty of the court to hold that it was unconstitutional. In passing upon the constitutionality of the act, however, it is necessary to bear in mind what are the tests to be applied, and how and in what manner the constitutionality of the law is to be determined—whether from the face of the act itself or from proof aliunde as to its necessary operation and effect. We do not claim that we shall be able to reconcile the cases, yet it is important in this direction to reach a position we can legally sustain. Generally speaking, the sources to which the court may resort for aid in determining the question of the constitutionality are the law itself and such other considerations, facts, or circumstances of which the court can take judicial notice. Cases no doubt can be found where testimony has been taken, but that has been very seldom permitted, and only under extraordinary circumstances. The rule, as we shall show, is that we must examine the provisions themselves in the light of facts of which we can take judicial notice.

In the case of Commonwealth v. Roberts, 155 Mass. 281, 29 N. E. 522, 16 L. R. A. 400, a statute in many respects similar to that under consideration was presented for judicial examination. The statute provided (chapter 382, p. 884, Laws Mass. 1885) that certain buildings in Boston situated on a street in which there was a sewer should have water-closets connected therewith, and no cesspools or privies, except temporarily, where authorized by the board of health. It was admitted therein that the defendant's house was not provided with a water-closet connected with the sewer in the street, and that the building in the yard had beneath it a brick vault, connected with the sewer by a trap, and water flowed into the excavation when it rained, and the

excavation could be flushed by a hose in the yard, and was so flushed by the defendant from time to time by a man sent for the purpose. It was held that the judgment against the defendant should be affirmed, the court saying:

"There can be no doubt that the statute in question is within the constitutional powers of the Legislature as a police regulation. It is an act for the preservation of the public health, and relates to the disposal of one of the most dangerous forms of sewage. As said by Morton, J., in Nickerson v. Boston, 131 Mass. 306, 308: 'It belongs to that class of police regulations to which private rights are held subject, and is founded upon the right of the public to protect itself from nuisances and to preserve the general health. The authority of the Legislature to pass laws of this character is too well settled to be questioned.' "

And it was further said therein with respect to a contention which is also made here:

"The defendant, however, contends that, as her structure was lawful when built, an act of the Legislature which would render its use unlawful would be unconstitutional [citing Commonwealth v. Alger, 7 Cush. 53, 103]. The statutes there in controversy related to harbor lines in Boston, and were not police regulations affecting the public health."

In Rhode Island also, in the case of Harrington v. City of Providence, 20 R. I. 233, 38 Atl. 1, 38 L. R. A. 305, a similar statute, providing for the drainage of land into sewers, and directing the removal of privy vaults, was upheld as constitutional because a proper exercise of the police power. Various definitions of the police power are therein given, including that of Chief Justice Shaw in Commonwealth v. Alger, 7 Cush. 53, 85, wherein he distinguishes it from the right of eminent domain as follows:

"The power we allude to is rather, the police power—the power vested in the Legislature by the Constitution to make, ordain, and establish all manner of wholesome and reasonable laws, statutes, and ordinances, either with penalties or without, not repugnant to the Constitution, as they shall judge to be for the good and welfare of the commonwealth and of the subjects of the same. * * * Nor does the prohibition of such noxious use of property—a prohibition imposed because such use would be injurious to the public, although it may diminish the profit of the owner—make it an appropriation to the public use, so as to entitle the owner to compensation. * * * If a landlord could let his building for a smallpox hospital or a slaughter house, he might obtain an increased rent. But he is restrained, not because the public have occasion to make a like use, or to make any use of the property, or to take any benefit or profit themselves from it, but because it would be a noxious use, contrary to the maxim, 'Sic utere tuo ut alienum non lœdas.' It is not an appropriation of the property to a public use, but the restraint of an injurious private use by the owner, and is therefore not within the principle of property taken under the right of eminent domain."

And it is said in that case with respect to the receptacles known as privy vaults:

"It is common knowledge that the condition in which they shall be kept when allowed to exist, their construction, their locality, the time and manner of removing their contents, have, especially in cities, been subjected to sharp police regulation. * * * Their very presence is a menace to comfort and health and a source of apprehension to the neighborhood. The best that can be done so long, as they exist is to reduce the dangers within them to the minimum, and which, if vigilance be relaxed, soon loom up to the maximum. * * * But it is contended on the part of the appellants that the privy vault itself, when properly used, is neither a nuisance nor injurious to health or

comfort; that it only becomes so when not properly cared for; and therefore that its abuse or improper use alone makes it subject to police regulation and repression.   The storage of gunpowder, the existence of buildings of such character and condition as to make them liable to catch fire in thickly settled neighborhoods, have frequently been the subject of police regulation and repression, but neither would do any actual harm until carelessness, accident, or some unforeseen agency set them on fire—an event that might never happen; and yet the menace and the apprehension caused by their presence have been frequently deemed sufficient to justify their removal under the police power."

The principles thus enunciated in other jurisdictions have found sanction in our own courts, and the subject of police power received an ample discussion in the case of Health Department v. Rector, 145 N. Y. 32, 39 N. E. 833, 45 Am. St. Rep. 579, wherein the provisions of the consolidation act requiring in tenement houses adequate facilities for the supply of water were under consideration; and it was said:

"Laws and regulations of a police nature, though they may disturb the enjoyment of individual rights, are not unconstitutional, though no provision is made for compensation for such disturbances.   They do not appropriate private property for public use, but simply regulate its use and enjoyment by the owner.   If he suffer injury, it is either damnum absque injuria, or, in the theory of the law, he is compensated for it by sharing in the general benefits which the regulations are intended and calculated to secure.   *  *  *   The state, or its agent in enforcing its mandate, takes no property of the citizen when it simply directs the making of these improvements.   *  *  *   One of the late instances of this kind of legislation is to be found in the law regulating manufacturing establishments.   *  *  *   The provisions of that act could not be carried out without the expenditure of a considerable sum by the owners of then existing factory.   *  *  *   Any one in a crowded city who desires to erect a building is subject, at every turn almost, to the exactions of the law in regard to provisions for health, for safety from fire, and for other purposes.   *  *  *   Under the police power persons and property are subjected to all kinds of restraints and burdens in order to secure the general comfort and health of the public.   *  *  *   The tenement house in New York is a subject of very great thought and anxiety to the residents of that city.   The numbers of people that live in such houses, their size, their ventilation, their cleanliness, their liability to fires, the exposure of their occupants to contagious diseases, and the consequent spread of the contagion through the city and the country,   *  *  *   all these are subjects which must arouse the attention of the legislator, and which it behooves him to see to in order that such laws are enacted as shall directly tend to the improvement of the health, safety, and morals of those men and women who are to be found in such houses.   *  *  *   We feel that we ought to inspect with very great care any law in regard to tenement houses in New York, and to hesitate before declaring any such law invalid, so long as it seems to tend plainly in the direction we have spoken of, and to be reasonable in its provisions.   If we can see that the object of this law is without doubt the promotion or the protection of the health of the inmates of these houses, or the preservation of the houses themselves, and consequently much other property, from loss or destruction by fire, and if the act can be enforced at a reasonable cost to the owner, then, in our opinion, it ought to be sustained."

In the light of these authorities we think that the provisions of law here presented are such as the Legislature, in the exercise of the police power of the state, may enact, and that the constitutional rights of the defendant have in no way been violated.   There is and can be no object in this law other than the preservation of the public health in the suppression of a source of disease and contagion and the substitution of improved sanitary accommodations.   These new accom-

modations are only such as, after investigation, the Legislature has concluded are of actual necessity in preventing unhealthful surroundings in tenement houses; and we cannot say that they show themselves to be of such an unreasonable nature as to warrant us in declaring the law an unconstitutional invasion of the defendant's rights. Nor, as stated, do we feel called upon to discuss at length the many points presented in the affidavits submitted upon the motion as to whether school sinks are safe and reliable, and the changes proposed are unwise and unnecessary. Upon its face the law does not present an unreasonable requirement either as to the nature of the changes directed or the expense entailed by them; and, as the statute is one which prescribes a general regulation, not dependent upon a determination as to the dangerous character of the evil sought to be abated, we are not obliged in every instance to pass upon the reasonableness of its enforcement. The distinction thus to be made is defined in Fire Department v. Gilmour, 149 N. Y. 453, 44 N. E. 177, 52 Am. St. Rep. 748, wherein the court says:

"In other words, where the Legislature, in the exercise of the police power, enacts a regulation defining the duty of citizens, either in respect to their personal conduct or the use of their property, the reasonableness of the thing enjoined or prohibited is not an open question, because the supreme legislative power has determined it by enacting the rule. Dil. on Mun. Cor. § 328, and cases cited. But where the Legislature * * * enacts no general rule of conduct, but invests a subordinate board with the power to investigate and determine the fact whether, in any special case, any use is made of property * * * dangerous on account of its liability to originate or extend a conflagration, * * * then we are of opinion that in such cases the reasonableness of the determination of the board or of the order * , * * is open to contestation by the party affected thereby."

This rule was considered at length in the case of People ex rel. Kemmler v. Durston, 55 Hun, 64, 7 N. Y. Supp. 813, affirmed 119 N. Y. 569, 24 N. E. 6, 7 L. R. A. 715, 16 Am. St. Rep. 859, and in 136 U. S. 436, 10 Sup. Ct. 930, 34 L. Ed. 519, an action brought to test the constitutionality of the electrocution law; and it was said in the opinion of the General Term:

"No rule of law is better settled than that every intendment is in favor of the constitutional validity of legislative acts. People v. Home Ins. Co., 92 N. Y. 328; Matter Elev. R. R. Co., 70 N. Y. 327; People ex rel. Bolton v. Albertson, 55 N. Y. 50. The rule includes intendments of fact as well as of legal interpretation, and we are bound to presume that the Legislature knew, even though the court may be ignorant, of the facts necessarily involved in the legislative action. In this respect the presumption which arises upon the statute must be conclusive on the court, and not liable to be rebutted by proof aliunde. * * * In the case of Matter of Elevated Railroad Company, supra, it was said that the courts cannot take proofs aliunde for the purpose of ascertaining whether a statute, valid and regular upon its face, is unconstitutional."

And in the opinion of the Court of Appeals it was said:

"If it cannot be made to appear that a law is in conflict with the Constitution by argument deduced from the language of the law itself, or from matters of which a court can take judicial notice, then the act must stand. The testimony of expert or other witnesses is not admissible to show that in carrying out a law enacted by the Legislature some provision of the Constitution may possibly be violated. * * * Whether the use of electricity as an

agency for producing death constituted a more humane method * * * was a question for the determination of the Legislature."

Thereafter the court says:

"The testimony, * * * while not available to impeach the validity of the legislation, may, we think, be regarded as a valuable collection of facts and opinions * * * as part of the argument for the relator, but nothing more. We have examined this testimony, and * * * agree with the court below that it removes every reasonable doubt that the application of electricity * * * in the manner contemplated by the statute must result in instantaneous, and consequently painless, death."

A similar case is that of People v. Cipperly, 101 N. Y. 634, 4 N. E. 107, sustaining the constitutionality of the statute which forbade the sale of adulterated milk (chapter 202, p. 255, Laws 1884), wherein it was said:

"But the defendant takes the broader ground that the Legislature cannot, under the Constitution, prohibit the sale of milk drawn from healthy cows, which in its natural state falls below the standard fixed by the act, unless such milk or the articles made from it are in fact unwholesome, or dangerous to public health. How is that question of fact to be determined? The court cannot take judicial notice whether milk below the standard is or is not wholesome or dangerous to public health. Is that to be a question for the jury? If so, the court must charge the jury in each case that, if they find milk below that standard to be unwholesome, then the statute is constitutional; if they find it to be wholesome, then the statute is unconstitutional. Evidently a constitutional question cannot be settled, or rather unsettled, in that way. The constitutionality would vary with the varying judgments of juries."

In the case at bar it is conceded that the requirement of the statute was not complied with, and the nature of the changes directed is not disputed, and their cost, compared with the value of the premises, appears; and in this action, brought to enjoin the continuance of the school sink, and to enforce the substitution therefor of the accommodations prescribed in the act, no question remained excepting whether upon its face the provision of the act was unconstitutional. This was purely a question of law, and hence the disposition of the issue presented by an order was proper, and sufficient to raise the question upon this appeal.

We have not overlooked the contention based upon the relation of the cost of removing the school sink and replacing it by other accommodations to the equity which the defendant has in the property. It would appear that the effect of the change would be to practically wipe out the defendant's equity, and thus, so far as she is concerned, the law will, if enforced, be a great hardship. It will be noticed that her equity is about one-third of the full value of the premises; but, apart from this, if the extent of the injury which would be inflicted upon a particular individual was controlling upon the constitutionality of the act, then it would be difficult, if not impossible, to have any fixed criterion for determining its constitutionality, because, with respect to the value of certain premises on which a school sink was required to be replaced, the cost, as compared with the value of the property, might be very small, whereas in the case at bar it equals, and we can conceive of instances where it might exceed, the equity of the owner. We have examined the

affidavits upon the subject of the character of the premises, the conditions prevailing, and the advisability of the changes, but think that they present considerations which are proper to be addressed to the Legislature, and not to the court.

Our conclusion is that the law assailed is constitutional, and that the order should accordingly be affirmed, with $10 costs and disbursements. All concur.