SARAH T. COCKCROFT, as Executrix of and Sole Legatee and Devisee under the Last Will and Testament of JOHN V. COCKCROFT, Deceased, Appellant, *v.* JOHN MITCHELL and Others, Composing the INDUSTRIAL COMMISSION OF THE DEPARTMENT OF LABOR OF THE STATE OF NEW YORK, Respondents.

First Department, January 10, 1919.

Constitutional law — Labor Law, section 79b, establishing requirements for safeguarding employees in existing factory buildings against fire is valid exercise of police power — enforcement of statute — validity and reasonableness of orders by Industrial Commission — action by owner of factory building to determine validity of orders of Industrial Commission made under section 79b of Labor Law — evidence.

Section 79b of the Labor Law, which establishes the minimum requirements of safety in all factory buildings erected in this State prior to October 1, 1913, for the safeguarding of employees against fire, is a valid exercise of the police power, and is constitutional.

While in many instances compliance with said section may entail hardship upon the owners of buildings which at the time of their erection fully complied with all existing provisions of law, such hardship does not mean confiscation, and unless it results from the unreasonable exercise of arbitrary power on the part of the Legislature, no degree of hardship can justify the court in nullifying the statute, since it is the primary duty of the Legislature to protect the common interests of the whole people, even at the expense of personal or local interests.

The mere fact that the statute cannot be enforced without causing expense to the citizen who comes within its provisions furnishes no constitutional obstacle to its enforcement.

The fact that the exercise of the power may disturb the enjoyment of individual rights without compensation for such disturbance does not make laws and regulations of a public nature unconstitutional.

In an action under sections 52a and 52b of the Labor Law to review a decision of the Industrial Commission of the State Department of Labor, made on appeal from certain orders issued and modified by said Commission, which required plaintiff, who is the owner of a sixteen-story building used for factory purposes, with an occupancy of over 600 persons, two-thirds of whom are engaged in factory work, and located on a busy corner in the city of New York, and having no exit whatever conforming to the requirements of section 79b of the Labor Law, to (1) inclose the existing interior stairway with fire-resisting material; (2) construct an exterior screened stairway or fire escape on the north

side of the building running from the roof to the second floor with described openings thereto above, and therefrom below, the second floor, and (3) to construct a° fire wall throughout the building, evidence examined and

*Held*, that plaintiff's factory building is unsafe for occupants in case of fire; that the orders of the Commission in their modified form are valid and reasonable, and that the plaintiff's complaint should be dismissed.

APPEAL by the plaintiff, Sarah T. Cockcroft, as executrix, etc., from a judgment of the Supreme Court in favor of the defendants and against John V. Cockcroft, since deceased, entered in the office of the clerk of the county of New York on the 29th day of October, 1917, dismissing the complaint on the merits upon the decision of the court after a trial at the New York Special Term.

*W. H. L. Edwards*, for the appellant.

*Frederick H. Cunningham*, for the respondents.

Judgment affirmed, with costs, on the opinion of GAVEGAN, J., at Special Term. (Reported in 101 Misc. Rep. 211.)

Present — DOWLING, LAUGHLIN, SMITH, PAGE and SHEARN, JJ.

The following is the opinion of the Special Term:

GAVEGAN, J.:

This is an action to review a decision of the Industrial Commission of the Labor Department, made following a hearing upon a verified appeal from certain orders issued by said Commission against plaintiff's property. Its institution is expressly authorized under sections 52a and 52b of the Labor Law.* Section 79b of the Labor Law† is the special object of attack herein. It requires (1) that every factory building over two stories in height shall be provided on each floor with at least two means of exit or escape from fire remote from each other, and (2) that all interior stairways serving as required means of exit in factory buildings more

---

* Consol. Laws, chap. 31 (Laws of 1909, chap. 36), §§ 52a, 52b, as added by Laws of 1915, chap. 674.— [REP.

† Added by Laws of 1913, chap. 461, as amd. by Laws of 1914, chaps. 182, 366, and Laws of 1915, chap. 719.— [REP.

than five stories high together with their landings, platforms and passageways, shall be inclosed on all sides by partitions of fire-resisting material extending continuously from the basement to three feet above the roof.

The plaintiff is the owner of a building at 71–73 Nassau street, in the borough of Manhattan, city of New York, and the defendants compose the State Industrial Commission of the State of New York.

Stated as briefly as is consistent with clearness, the facts are as follows: The property, known as the Cockcroft Building, is located on a lot 100 feet by 50 feet, at the northwest corner of Nassau and John streets, one of the busiest corners on two of the busiest thoroughfares in lower New York. It is a sixteen-story structure tenanted largely by manufacturing jewelers, with an aggregate occupancy of over 600 persons, including both sexes, of whom nearly 400 were engaged in factory work. It is equipped with one interior stairway reaching from the ground to the roof inclosed on three sides only with the fourth side open to the main corridor which is separated from the working rooms on each floor by non-fireproof partitions. Directly alongside this stairway, in one fireproof but not smokeproof shaft, are the three elevators of the building, which, it appears, owing to machinery troubles, sometimes fail to operate. Leading down from the top of the building to the roof of its first floor extended, is the only outside fire escape and it is reached from the same common corridor as the stairs and elevators. This fire escape is sub-standard, without any " get-away " at its foot other than through windows. All floors, excepting the seventh, are subdivided into numerous large and small rooms occupied mostly for jewelry manufacturing and allied industries. In this work are used motor driven machines ranging from small drills to rolling machines, having a maximum weight of 400 pounds on a floor base two feet square. The building was constructed under the classification of " office building," with typical floors to sustain a floor load of only 75 pounds per square foot. In the manufacturing processes alcohol and other highly inflammable substances are used, but in small quantities.

These were the conditions obtaining when the defendants

issued a set of orders, July 30, 1915, containing the following requirements: (1) Provide additional means of exit on each floor of building, remote from existing exit. (2) Inclose all interior stairways serving as a required means of exit, and the landings, platforms and passageways connecting therewith, on all sides with partitions of fire-resisting material, extending continuously from the basement to three feet above the roof. (3) Provide all openings in said partitions with self-closing doors, consisting of fire-resisting material.

Plaintiff obtained a hearing before the Commission at which he contended that these orders were unreasonable and asked that they be rescinded or modified. Defendants consented to a modification of the orders which plaintiff, however, declined to accept. Refusing to comply with the original orders, plaintiff then availed himself of the right of action provided for under the statute.

Plaintiff contends that because of the expenditure involved, together with the loss of income from the building consequent upon the taking of space from the offices of his tenants, said orders are unreasonable and confiscatory and, therefore, violate provisions of the Constitution of the United States.* Defendants, on the other hand, maintain that the enactment of said statute and the enforcement of the orders thereunder constitute a valid exercise of the police powers of the State necessary for the safeguarding of employees against the dangers of fire.

The cost of carrying out the orders in accordance with the original plan is estimated at $38,151, and under the so-called variation plan, $20,307. The gross annual income from the building is $110,000, and the total maintenance cost is $101,355.66, leaving a net income of $8,664.34. The property has a first mortgage of $810,000, and a second mortgage of $50,000, totaling an annual interest charge of $43,500. The building is valued at $409,293, and the plot at $707,420, making a valuation of $1,116,713 for the entire property.

The question of law involved is, whether said section 79b of the Labor Law is unconstitutional. The case also presents

---

* See U. S. Const. art. 1, § 10, subd. 1; Id. 14th Amendt. § 1. See, also, State Const. art. 1, § 6.— [REP.

a cardinal question of fact, as to whether the orders, issued by the defendants against the property of the plaintiff, are valid and reasonable. This debatable point is to be determined from the voluminous testimony of a four days' trial; hence the added length of the opinion.

The statute assailed must stand or fall under the police powers of the State. That which was legal before its enactment has become illegal and only the exercise of the police powers of the State can justify such a change. In order to stand it must be shown that the Legislature had in mind the protection of lives and also that it had sufficient ground for the exercise of its inherent police powers to bring about that protection. This is all made to appear in the history of the " exit " statutes themselves, which is a part of the record in the case.

Immediately after the Triangle Waist Company fire, which occurred on March 25, 1911, resulting in the loss of 146 human lives, the Legislature created a Commission to investigate the " existing conditions under which manufacture is carried on, * * * including * * * matters affecting the health and safety of operatives as well as the security and best interests of the public."*

This Commission devoted two years of intelligent and conscientious labor to the subject, carrying on extensive investigations and taking a great volume of expert testimony, including testimony on the subject of exits from factories, of which this court may take judicial notice. (*People* v. *Charles Schweinler Press,* 214 N. Y. 395.) The resulting disclosure of conditions existing in the factories of this State brought forth a popular demand for remedial legislation. Aided by the comprehensive report of its Commission, the Legislature, basing its conclusions on investigation and necessity, forthwith enacted the following measures: (1) Section 79b of the Labor Law, which establishes the minimum requirements of safety in all factory buildings in this State erected prior to October 1, 1913; (2) section 94 of the same law,† which places upon the owner of a tenant factory building

* See Laws of 1911, chap. 561.— [REP.

† Amd. by Laws of 1915, chap. 653.— [REP.

the responsibility for carrying out the provisions of section 79b; and (3) section 1275 of the Penal Law,* which provides for fine and imprisonment in case of violations. In addition to complying with safety requirements, in which he has no alternative under section 79b of the Labor Law, every owner of a tenant factory building erected prior to October 1, 1913, must also obey all orders issued pursuant thereto, since legal orders issued by virtue of this section have the full force and effect of law. (*McRickard* v. *Flint*, 114 N. Y. 222; *Shields* v. *Pugh & Co.*, 122 App. Div. 586.)

It is true that these provisions constitute a forward step in remedial legislation, quite in advance of anything heretofore undertaken by the Legislature in the exercise of its police powers. It is also true that in many instances, clearly so in the case at bar, compliance with these provisions may entail hardship upon the owners of buildings which at the time of their erection fully complied with all existing provisions of law. Hardship, however, does not mean confiscation, and unless it results from the unreasonable exercise of arbitrary power on the part of the Legislature, no degree of hardship can justify the court in nullifying legislative enactments embodying the will of the people, since it is the primary duty of the Legislature to protect the common interests of the whole people, even at the expense of personal or local interests. The mere fact that the law cannot be enforced without causing expense to the citizen who comes within its provisions, furnishes no constitutional obstacle to such enforcement. (*Health Department* v. *Rector, etc.*, 145 N. Y. 32.) That the police powers of the State include everything essential to the public safety, justifying the destruction or abatement of public nuisances, even to the demolition of buildings in the path of conflagration, has long been settled law. The fact that the exercise of the power may disturb the enjoyment of individual rights without compensation for such disturbances does not make laws and regulations of a public nature unconstitutional, for they do not appropriate property for public use, but simply regulate its use and enjoyment by the owner. (*Health Department* v. *Rector, etc., supra.*) If the extent of the injury which would

---

* Penal Law, § 1275, as amd. by Laws of 1913, chap. 349.— [Rep.

be inflicted upon private individuals were controlling upon the constitutionality of the act, then it would be difficult if not impossible to have any fixed criterion, since the cost of compliance in some cases might be very small, while in others it might equal, or even exceed, the equity of the owner. Such considerations are proper to address to the Legislature but not to the court. (*Tenement House Department* v. *Moeschen*, 89 App. Div. 526.) Even assuming that the law were " mischievous in its tendencies, * * * the responsibility therefor rests upon legislators, not upon the courts. No evils arising from such legislation could be more far-reaching than those that might come to our system of government if the judiciary, abandoning the sphere assigned to it by the fundamental law, should enter the domain of legislation, and upon grounds merely of justice or reason or wisdom annul statutes that had received the sanction of the people's representatives. * * * It is the solemn duty of the courts * * * to guard the constitutional rights of the citizen against merely arbitrary power. It is equally true * * * that legislative enactments should be recognized and enforced by the courts as embodying the will of the people, unless they are plainly and palpably, beyond all question, in violation of the fundamental law of the Constitution." (*Atkin* v. *Kansas*, 191 U. S. 207, 223.)

Merely because it is a step in advance, section 79b of the Labor Law cannot be said to be plainly and palpably in violation of the Constitution. It is rather one of those amendments to the structure of the law now being made with increasing frequency by a Legislature which recognizes the trend of modern thought with respect to social justice. When the Legislature created the Factory Investigating Commission it sought light upon " matters affecting the health and safety of operatives as well as the security and best interests of the public." It seems obvious, particularly at this crucial time in the affairs of the nation, that " the health and safety of operatives " are identical with " the security and best interests of the public." Moreover, in its application to this case the " safety of operatives " necessarily includes the safety of all members of the community who have occasion to go into the building as well as of the factory operatives and other persons who are employed therein.

Until the occurrence of the Triangle Waist Company fire, in which the " exit " law may be said to have had its genesis, the Legislature had apparently given no thought to the grave dangers to human life that were lurking in factories, and the lesson taught by that lamentable disaster made quick disposition of any technical barrier which might be placed in the way of the lawmakers, on the ground of class legislation. Certainly the constitutional inhibition against class legislation cannot be deemed to relate to a particular class of people who are compelled to provide safeguards for the public. " Neither is it an effective objection to a statute if some of those who will be protected by its provisions oppose such protection, for the State has such an interest in the welfare of its citizens that it may if necessary protect them against even their own indifference, error or recklessness." (*People* v. *Charles Schweinler Press, supra,* 407.) When the Legislature made this wise provision for the safety of operatives, it did no more than give recognition to a necessary inference from a universally known fact, namely, that there is grave danger to human life, not only in fire itself, but also in that instinctive fear which is born of fire in the form of panic. This to my mind is the one new and most beneficial element in the law under discussion.

Some of the cases cited by plaintiff in my opinion sustain the law he impugns. Quoted fragments of opinion therefrom are either misleading when detached from their context or unnecessary to the decision reached. Included in this class are the following: *Lawton* v. *Steele* (152 U. S. 133); *Health Department* v. *Rector, etc. (supra)*; *Atchison, Topeka, etc., Railroad* v. *Matthews* (174 U. S. 96); *Tenement House Department* v. *Moeschen (supra)*; *Coe* v. *Schultz* (47 Barb. 64); *Rideout* v. *Knox* (148 Mass. 368).

The other decisions relied on by plaintiff involve facts and present questions which are foreign to the present inquiry. They are so lacking in any basis of relevant inference as to be unavailable even for purposes of analogy. They deal with statutes which, under the guise of legislative police power, aim to deprive persons of their property or business without due process of law by declaring vested interests therein obnoxious to the public; or with statutes assumed to be for

the public health, safety or morals, but which, without accomplishing that purpose, direct the confiscation or curtailment of private property or business; or finally, with statutes which seek to impose regulations so unreasonable as to be in violation of the right of personal liberty. They all hold, and necessarily so, that such legislation is unconstitutional. They have no bearing here because the statute under consideration was passed for the better safety and protection of the public, its operation in this case through the orders of the State Industrial Commission is valid and reasonable, and the orders themselves were issued in pursuance of the design for which the law was enacted, namely, the safety and protection of a large body of the citizens of the State. Without setting forth the analysis of them which I have made in detail, suffice it to say the cases relied on by the plaintiff that are inapplicable or distinguishable on one or more of the foregoing grounds are comprised in the following list: *People* v. *Hawkins* (157 N. Y. 1); *Ives* v. *South Buffalo Railway Co.* (201 id. 271); *Litchfield* v. *Bond* (186 id. 66); *People ex rel. Wineburgh Advertising Co.* v. *Murphy* (195 id. 126); *People ex rel. Standard Bill Posting Co.* v. *Hastings* (77 Misc. Rep. 453); *Wynehamer* v. *People* (13 N. Y. 378); *People ex rel. McPike* v. *Van De Carr* (178 id. 425); *Matter of Cheesebrough* (78 id. 232); *Grossman* v. *Caminez* (79 App. Div. 15); *Signell* v. *Wallace* (35 Misc. Rep. 656). In none of these cases was the statute assailed enacted for the public health and public safety, nor in any one does it appear that the statute upset was based upon any investigation or reason other than the arbitrary action of the legislators. Certain clauses in some of the opinions quoted in plaintiff's brief sound in harmony with his contention, but in each instance a careful examination into the facts and the scope of the decision, as distinguished from the opinion of the individual judge uttering the decision, fails to disclose any solid ground upon which to base a successful attack against the constitutionality of the law.

Leaving his authorities and coming now to the plaintiff's argument it will be seen that it is based chiefly on those familiar grounds commonly availed of when the constitutionality of a remedial statute is the object of attack, namely, that the provisions of the Exit Law under consideration

deprive him of his property without due process of law, threaten to destroy his vested rights and deny him equal protection of the laws. But the inferences from which these conclusions are drawn are based upon assumed facts not established by the evidence. I am not convinced, for example, that the expenditure necessary to comply with the Exit Law in this case, under the modified plan of the orders involved, would have been, if complied with when issued, or, for that matter, will be now, either confiscatory or unreasonable. As to what it would have cost to comply with the original plan of the orders and whether such cost would have amounted to confiscation — these I regard as academic questions whose decision has already been obviated by the Commission in the liberal exercise of its powers of modification, under the terms of the law itself.

The same considerations of unsubstantiality apply to the plaintiff's contention that, because he complied with all laws at the time of the construction of the building, the new Exit Law threatens a destruction of his vested property rights. If such a contention were to prevail it would make an end of all remedial legislation. Examples constantly occur, as in the case of our Tenement House Law, where individual owners are compelled to suffer similar hardships in order that a rule for the common good shall be observed. (*Health Department* v. *Rector, etc., supra; Tenement House Department* v. *Moeschen, supra; Matter of City of Brooklyn,* 87 Hun, 54; *Coe* v. *Schultz, supra.*)

For final objection to the constitutionality of the statute in question the plaintiff urges that the definitions of the terms " labor " and " factory-building " therein * constitute an arbitrary and unreasonable discrimination against other classes of owners and employees, and that the law itself is too broad because it fails to properly classify buildings in which labor is performed, thereby denying him equal protection of the laws. The answer to this is, that the primary purpose of the Legislature was to protect the lives of " factory operatives,"

---

* See Labor Law, § 2, as amd. by Laws of 1913, chap. 529; Laws of 1914, chap. 512, and Laws of 1915, chap. 650. Since amd. by Laws of 1917, chap. 694.— [REP.

as a means of better securing public safety, and in defining the word " labor " as applied to buildings affected, it had in mind labor engaged in the manufacture of some material product as distinguished from the employment of those engaged in business or professional pursuits. Nor can the term be so construed as to apply to mechanical or manual labor which is necessary and incidental to the repair and maintenance of a building.

The ingenious illustration offered by the plaintiff to show that, under the act, even two employees engaged in manufacturing would make the place of their employment a " factory building," while two partners doing the same work would not, is not convincing; the latter would not create fire hazard to the same extent as the former. It is inherent in human nature that, assuming the instinct of self-preservation to be equally strong in both, the employee with only his wage at stake, will create more fire hazard than the employer with his property and business at stake.

On the question of arbitrary classification of buildings, there is no analogy to be found in the custom of fire insurance companies, under which different premium rates are charged for insuring different buildings, according to risk classification, since it ignores the distinction between loss of property and loss of life. Further classification of buildings is not required by the facts where it appears that the danger of panic as distinguished from fire itself is common to all buildings whose type of occupancy is that of laborers. I reach the conclusion that the statute is a valid exercise of the police power of the State and, therefore, constitutional.

The law being upheld as constitutional it becomes necessary to consider the second proposition, as to whether the orders involved are valid and reasonable. Here I may state that the question of the orders would have to abide by the decision on the law's constitutionality, and I should decline to review the discretion of the Commission, in the absence of proof showing bad faith, as a matter outside of the province of the court, were it not for the express provisions of the statute which call for such review. (*Louisville & Nashville Railroad v. Kentucky,* 161 U. S. 701.)

The evidence shows that the building in question is a

factory building and that it is not equipped in accordance with the statutory requirements for factory buildings. The State Industrial Commission is a legally constituted body, clothed with certain delegated legislative powers. Under the plain wording of the statute, which applies to all buildings used for factory purposes, there can be no question but that said Commission had jurisdiction of the subject-matter, and was acting well within the scope of its authority in issuing the orders complained of. Therefore, plaintiff's argument that the orders are invalid does not call for serious refutation, unless indeed it be based on the claim that they are unreasonable, which must in turn be proved by a fair preponderance of the evidence.

Bearing in mind the purpose of the Legislature in enacting the " exit " law, the question of the reasonableness of the orders involved must be determined, not alone by standards of dollars and cents, but as well by the broader standard of humanity, in the light of its weaknesses and in the light of past experience and catastrophes, as disclosed by the evidence in the case.

It cannot be too often emphasized that the law is primarily an " exit " statute rather than merely a fire statute. The clause " adequate and safe means of escape for the occupants in case of fire," must be so construed as to give practical effect to the legislative intent which was to safeguard the lives of factory operatives. The words " in case of fire " must be so interpreted as to include all danger from fire, and it is notorious that danger from fire includes panic. Panic may result from causes not confined to a factory building itself nor affected by its fireproof character. It may be caused by smoke alone, or by fire in a building adjoining or in the immediate neighborhood, or by a conflagration, or by hostile attack in time of war from land, sea or air, or by earthquake, or even by a false alarm.

The reasonableness of the orders, therefore, depends directly on the answer to the question, " Is the building safe from the danger of panic? " As already pointed out, it is a sixteen-story structure, 193 feet in height, used for factory purposes, with an occupancy of over 600 persons, of whom nearly 400 are engaged in factory work. Its sole interior stairway used

as a means of exit is not inclosed with fire-resisting materials, nor is there any exit whatever therein that conforms to the requirements of the law, which it is the duty of the defendants to enforce.

It would be difficult to find a more vivid presentation of undisputed facts, all pointing to the same conclusion, than is contained in the record of this case; and that conclusion to my mind is, that the building is unsafe. So far from plaintiff's establishing the affirmative of that proposition by a fair preponderance of the evidence, it seems to me that its negative is established by the testimony of the defense alone.

The disputed questions on the other hand are for the most part matters of opinion, from the testimony of expert witnesses on either side, the plaintiff's experts holding that the building is reasonably safe for occupants in case of fire, and the defendants' experts maintaining that it is unsafe, but that compliance with defendants' orders would make it reasonably safe.

Defendants' experts are public officers, burdened with the responsibility of carrying out the public functions intrusted to them, and the fact that they are in the employ of the State should not detract from the weight of their testimony, as compared with that of experts testifying under the retainer of the plaintiff. Here again the distinction between loss of life and loss of property must not be overlooked and I get the distinct impression that the opinions of the plaintiff's expert witnesses would be more valuable in a question involving fire insurance than they are in a question involving safety insurance. On the other hand, the opinions of the defendants' witnesses are corroborated by my own convictions as to the safety of the building, after listening to all the evidence in the case.

Much stress is laid by the plaintiff on the fact that the building is fireproof, that only four fires have occurred therein since its erection, and that these did not spread, although three of them occurred either on holidays or during hours when the building was unoccupied. This argument, however, does not take into account the danger which might have arisen from panic, as bearing upon the question of adequate exits, had these fires occurred during working hours when the building was filled with employees.

I am also unable to agree with the plaintiff that volatile oils, alcohol, benzine and other inflammable materials, employed in the manufacture of jewelry, do not add to the hazards of the building because used in small quantities and under license restrictions. Although they may be greatly reduced, dangers from such a source cannot be safely graduated on a scale of quantity. No more can the type of occupancy and alleged high standard of intelligence among the employees in the building be safely relied on as a preventive of panic in a life and death emergency. In short, a conclusive refutation of all of plaintiff's arguments respecting the safety of the building might be found in the single word " panic."

The plaintiff having failed to prove to the satisfaction of the court that the building is reasonably safe to be used for manufacturing purposes, it remains to consider the orders themselves to ascertain whether compliance with their terms would make the building safe. This refers to the variation plan of the orders, as I have already pointed out that any discussion of the reasonableness of the original orders would be purely academic.

The structural changes called for under the variation plan consist in (1) inclosing the existing interior stairway with fire-resisting material; (2) construction of an exterior screened stairway or fire escape on the north side of the building running from the roof to the second floor with described openings thereto above, and therefrom below, the second floor; (3) the construction of a fire wall throughout the building. The purpose of the last provision is to avoid the legal objection of proximity between the exits provided for in the first and second provisions, which seems to me reasonable because necessary for even a minimum compliance with the terms of the law. All three variations from the original orders are granted only during the period that ".present conditions of structure and occupancy are maintained." One of these conditions is " an occupancy of about 504 persons above the ground floor," which I construe in this particular instance to mean factory occupancy. As it is obvious that the danger to life from panic would increase with the number of operatives in the building, some limitation must, of course, be placed thereon, and the one adopted by the defendants seems emi-

nently fair and reasonable. In view of the fireproof character of the structure and adopting all other inferences most favorable to the plaintiff, I find that compliance with the foregoing provisions would render the building reasonably safe.

The estimated cost of these structural changes is $20,307, an amount $18,000 less than would have been the cost of compliance with the requirements of the original orders. It appears moreover that this cost would have been at least ten per cent less had the work been done at the time the orders were issued.

The annual rental damage, which is largely speculative, will amount approximately to only $600 under the variation plan, as against $11,000 under the original plan.

As to the alleged rental damage from loss of northern light, consequent upon the installation of the exterior screened stairway, I cannot regard it as material in the absence of a right of easement thereto in the plaintiff.

In questions involving the safety of the public, arguments based on loss and inconvenience to the individual are always of doubtful force. On the basis of figures recited in the statement of facts it appears that the annual net rental from the building is $8,664.34, representing, as plaintiff claims, a return of only one and forty-six one-hundredths per cent on his original investment in the property, and he argues therefrom that the orders are oppressive and unreasonable because they will cause a still further reduction in an income already sadly insufficient. It is true that these figures make a poor showing, but it will be seen on reflection that the small proportion of plaintiff's income to his claimed original investment in the property must be disregarded, since it cannot be said to have been influenced in the remotest degree by the orders under discussion. A decline in real estate values is no reason for exempting a building from the expense necessary to make it safe from fire. If such a rule were adopted it would be impossible for the city to enforce any building laws involving the expenditure of money, excepting in times when real estate values were high. The percentage of actual reduction in existent net income caused by compliance with these orders might be material, but whether that income were twenty per cent or one per cent, or even a loss, could not affect the

reasonableness of orders which had in no degree influenced prior net income. It is conceded by the plaintiff that on the basis of the variation plan the reduction in net income would be from one and forty-six one-hundredths per cent to one and thirty-one one-hundredths per cent; in other words, a reduction amounting to fifteen one-hundredths of one per cent. I am, therefore, of the opinion that considering the cost and character of the building, the expense to be incurred by plaintiff in complying with the terms of the variation orders is neither oppressive nor unreasonable.

Finally, the plaintiff would have it appear that, having complied with all provisions of the law existing at the time the structure was built, and the State having thereafter declared said provisions to be inadequate, he is now in effect being penalized for mistakes of oversight which are justly chargeable to the State itself. This contention is groundless and inept, for the evidence shows that the structure was built to be used as an office building, and that plaintiff not only diverted it from the use for which it was originally intended, but renewed leases to most of the manufacturers therein, even after the issuance of the orders complained of.

Moreover, the State can enact remedial laws only after it has been demonstrated that there are evils to be remedied. Actual experience, even human sacrifice, is often required in order to arrest the attention of the public and shock it into a realization of the necessity for remedial laws.

Experience in the matter of fire danger shows that so-called fireproof structures sometimes burn; that automatic fire alarms sometimes fail to alarm; that inside fire apparatus sometimes proves ineffective; that smoke from inflammable contents of fireproof buildings causes suffocation and death; that elevators sometimes refuse to work; that outside fire escapes are more serviceable as a means of entrance for firemen than as a means of escape for occupants; that the protection of the best fire department in the world is sometimes inadequate, and that persons of the highest intelligence often lose their presence of mind and become helpless victims of unreasoning panic.

All the above-mentioned precautions are good but they do not go far enough. The people of the State of New York

are no longer satisfied with measures that are merely good in matters involving life and death. They insist, within reasonable limits, upon the best measures of precaution that human and legislative foresight can devise, to the end that a recurrence of such tragedies as the Triangle Waist Company fire may in the future be prevented.

I am of the opinion that the orders complained of are reasonable in their modified form and necessary to carry out the spirit of the law in this particular case. This determination, coupled with the conclusion that the law is constitutional, requires a judgment for the defendants, dismissing the complaint, with costs.